UNITED STATES of America, Appellee,

v.

Robert L. STEPHENSON,
Defendant–Appellant.

No. 1551, Dockets 89–1185, 89–1217.

United States Court of Appeals,
Second Circuit.

Argued Sept. 29, 1989.
Decided Feb. 1, 1990.

Sean Connelly, Washington, D.C. (Stanley M. Brand, Brand & Lowell, Washington, D.C., of counsel), for defendant-appellant.

Steven A. Standiford, Asst. U.S. Atty., S.D.N.Y. (Benito Romano, U.S. Atty., for S.D.N.Y., Vincent L. Briccetti, Asst. U.S. Atty., S.D.N.Y., of counsel), for appellee.

Before OAKES, Chief Judge, and LUMBARD and PIERCE, Circuit Judges.

LUMBARD, Circuit Judge:

Robert L. Stephenson appeals from the judgment of conviction of the District Court for the Southern District of New York, Stewart, *Judge.* Following a jury trial, Stephenson was found guilty of three counts, for extortion under the Hobbs Act, 18 U.S.C. § 1951, bribery under 18 U.S.C. § 201(b)(2), and making false statements to government agents under 18 U.S.C. § 1001. He was acquitted on one count of conspiracy to commit an offense against the United States under 18 U.S.C. § 371. Judge

Stewart imposed concurrent sentences of thirty-eight months' imprisonment on each of the three counts, a fine of $100,000, and a $150 special assessment. Stephenson is serving the sentence.

Stephenson challenges the conviction on several grounds. First, he argues that, as a federal official, he was improperly convicted under the Hobbs Act, which he claims applies only to state and local officials. Second, he argues that he cannot be convicted under the false statement statute for making statements that are "literally true." Third, he asserts that venue was improper in the Southern District of New York. And fourth, he challenges the sentence under the Federal Sentencing Guidelines. The Government cross-appeals, claiming Judge Stewart erroneously refused to consider the sentence at an increased offense level under the Guidelines. We affirm the conviction but vacate the sentence and remand for resentencing.

I.

Stephenson was an Export Licensing Officer at the United States Department of Commerce in Washington, D.C., earning approximately $40,000 a year. His duties included reviewing applications for federal approval to export high-technology equipment from the United States to the Soviet Union, the People's Republic of China, and other countries. He was also responsible for seeking additional information or clarification from parties that have submitted deficient applications.

A. *The CHI Bribery Scheme*

In September 1985, Stephenson had lunch in Washington, D.C. with Blanquita Pelaez, a shipping manager with C.H. International, a small exporter based in San Jose, California. After Stephenson complained that he had been expending extra effort on behalf of CHI's license applications without being adequately compensated, Pelaez asked how much a license would cost. Stephenson replied, "Surprise me."

Following that meeting, Stephenson began to receive a series of payments from CHI officials. He received the first pay-

ment in October 1985: $5,000 in cash from Pelaez and Peter Chang, another CHI official. Over the next thirteen months, he accepted, in cash and jewelry, payments ranging in value from $5,000 to $30,000. There was testimony that after a cash payoff of more than $30,000 on March 6, 1986, Stephenson purchased a 1985 Mercedes Benz automobile for $37,000 in cash at an auction of property seized by police.

### B. The Zamax Bribery Scheme

In 1987, Zamax Co., an exporting company located in New York City, sought a Commerce Department license to ship high-technology medical equipment to China. Wilson Chang, the president of Zamax, enlisted the help of Pelaez in the licensing process, and Pelaez filed the applications on Zamax's behalf. In mid-October 1987, Stephenson telephoned Ken Yeh, a Zamax vice president, and informed him of several errors in the applications. Stephenson accused Zamax of intentionally understating the value of the equipment and warned Yeh that Chang could be "prosecuted and go to jail for this." Because Chang was in China at the time, Yeh set up a three-way conference call from New York with Chang and Stephenson. During this conference call, Stephenson repeated to Chang his accusations and warnings.

In late October, Yeh twice met with Stephenson in Washington to correct the problems with the applications. At the end of the second meeting, Stephenson told Yeh to "tell Wilson [Chang] after it's all done, I want five percent." When Yeh asked, "Five percent of what?," Stephenson replied: "Just go back and tell Wilson Chang I want five percent and he will understand."

When Yeh, upon Chang's return from China, informed Chang of this conversation, Chang contacted an attorney. From his New York office, Chang, on the advice of his attorney, recorded several telephone conversations with Stephenson, during which Stephenson repeated his warnings that the applications were in danger of being denied and that Chang was "gonna have a problem" because the applications

were "caught up in [the Department of Commerce Office of] Enforcement." Chang and his attorney then took the tapes to the office of the United States Attorney for the Southern District of New York, where they met with an Assistant U.S. Attorney and several FBI agents.

Working with the FBI, Chang met for lunch with Stephenson at a Washington hotel and secretly recorded the conversation. Stephenson stated that the problems with Zamax's applications could not be resolved "for less than thirty-five." Chang proposed instead that Zamax get its first license for free, pay $35,000 for the second, and negotiate a price for the third. When Stephenson responded that he would need some showing of good faith from Zamax, Chang offered to pay "five" for the first license and the "whole thing" for the second two. Stephenson and Chang agreed to meet the next day, when Chang would pay him $10,000 in partial payment of the $35,000 bribe.

The next day, Chang telephoned Stephenson from FBI headquarters in New York, but Stephenson was unavailable. When Stephenson returned the call, he explained that in case he were unavailable when Chang came to Washington to make the $10,000 payment, Chang should meet with another, unnamed Commerce Department official, with whom, Stephenson said, he would "leave everything." On November 23, Chang, accompanied by FBI agents and wearing a microphone, traveled to Washington to make the payment, but Stephenson refused to meet with him.

### C. The False Statements

In late November and early December 1987, Stephenson, still unaware that the telephone calls and lunch meeting had been recorded, began telling co-workers that Chang had offered him a bribe. On November 30, he told James Ingraham, a Commerce Department special agent, that a Chinese businessman had offered him bribes during a recent lunch and that he had refused the offers. He also told Ingraham that when he called a New York telephone number the businessman had

given him, he learned that the number was that of an FBI office.

On December 1, Stephenson related a similar story by telephone to Michael Dubensky, a Commerce Department special agent in New York. He said Chang had offered him a $10,000 bribe. When Dubensky asked why he had waited so long to contact an enforcement officer, Stephenson replied that he "didn't think too much of the bribe offers because bribe offers are almost a course of business with foreigners." Later, Stephenson had David Chan, the former president of CHI, telephoned Dubensky and inform him of Chang's alleged export violations.

## II.

### A. *The Hobbs Act Conviction*

■ Count Two of the indictment charged Stephenson with extortion in violation of the Hobbs Act. The Act states, in pertinent part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The Act goes on to define "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

Stephenson argues that he was improperly convicted under the Act because Congress did not intend it to apply to federal officials. His argument relies on the exercise of gleaning congressional intent from congressional silence. The Hobbs Act, he submits, already existed when other statutes that expressly prohibited bribe solicitation and extortion by federal officials were enacted. For example, in 18 U.S.C. § 201, which prohibits a range of bribe-related activity relating to public officials, the term "public official" encompasses federal officials only. *See* 18 U.S.C. § 201(a)(1). Likewise, 18 U.S.C. § 872 pro-

hibits extortion "under color or pretense of office" by anyone serving as an officer or employee "of the United States or any department or agency thereof...." In contrast, the Hobbs Act addresses similar substantive crimes but by its terms applies only to extortion "under color of official right." It says nothing about its application to federal officials.

Stephenson draws support from the proximity in time of the enactment of these statutes. He argues that if Congress intended the Hobbs Act to apply implicitly to federal officials, there would have been no purpose to the enactment, just five years later, of Section 872, which covers federal officials explicitly. Congress enacted the Hobbs Act in 1946 as an amendment to a 1934 statute, specifically using the word "extortion" to describe the prohibited activity of "obtain[ing] the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right." Section 872 was enacted in its current form in 1951, and it too used the term "extortion" but applied it expressly to federal officials. If the Hobbs Act, in 1946, was meant to govern the conduct of federal officials, Stephenson argues, then Congress would have been engaged in "a meaningless act" when it enacted Section 872 in 1951.

We find Stephenson's reasoning unpersuasive. First, we decline to fashion a restrictive view of a statute that is plain on its face. *See United States v. Hopkins*, 853 F.2d 118, 119 (2d Cir.1988); *United States v. Blackmon*, 839 F.2d 900, 904 (2d Cir.1988). The Hobbs Act speaks simply of extortion "under color of official right," with no indication of the "officials" to whom it applies. It states simply that "whoever" commits the prohibited act shall be punished. In contrast to the inference of intent Stephenson would have us draw from congressional silence and subsequent enactments, we believe Congress meant what it said, and here, the language of the statute makes clear that "official" extortion is outlawed—whether federal, state, or local. As the Supreme Court noted in response to a similar argument urging a restrictive view of a criminal statute plain on

its face, "We are not willing to narrow the plain meaning of even a criminal statute on the basis of a gestalt judgment as to what Congress probably intended." *Garcia v. United States*, 469 U.S. 70, 78, 105 S.Ct. 479, 484, 83 L.Ed.2d 472 (1984). *See also Amoco Prodn. Co. v. Village of Gambell*, 480 U.S. 531, 553, 107 S.Ct. 1396, 1398, 94 L.Ed.2d 542 (1987).

Second, Stephenson's resort to the legislative history to support his interpretation is unavailing. As noted, the argument rests on an inference: Stephenson cannot cite any authority, from the history of either the Hobbs Act or Section 872, stating explicitly that Congress meant to *exclude* federal officials from the reach of the Hobbs Act. Instead, he contends that the later, more specific enactment should prevail where the earlier, more general one is silent. This position ignores the fundamental principle that overlapping statutes "should be construed to coexist ... provided there is no contrary legislative intent and no repugnancy between the provisions." *United States v. Bradley*, 812 F.2d 774, 779 (2d Cir.), *cert. denied*, 484 U.S. 832, 108 S.Ct. 107, 98 L.Ed.2d 67 (1987), *citing United States v. Batchelder*, 442 U.S. 114, 122, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979). And "absent evidence of congressional intent to repeal, when a new statute overlaps a portion of an older one, the two statutes should be permitted to coexist unless the two are mutually exclusive." *United States v. Jackson*, 805 F.2d 457, 461 (2d Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987).

Although the two statutes contain many substantive similarities, they serve somewhat divergent purposes and easily coexist. One significant difference lies in the maximum punishments: The Hobbs Act allows fines of $10,000 and twenty-year prison terms while Section 872 allows fines of $5,000 and three-years' imprisonment. Moreover, the Hobbs Act contains a jurisdictional prerequisite that Section 872 does not. It requires that the acts forming the basis of the prosecution "obstruct[ ], delay[ ], or affect[ ] commerce," 18 U.S.C. § 1951(a). This distinction allows even comparatively mild acts of federal corruption to be subject to prosecution in federal court under Section 872 and the lesser penalties that statute provides. On the other hand, more significant extortionate acts, those that obstruct, delay or affect commerce, remain subject to the harsher punishments of the Hobbs Act regardless of whether the perpetrator holds a local, state or federal office. Thus the government may prosecute under whichever section is more suitable to the acts committed.

We employed the same analysis in *Jackson* with regard to two statutes dealing with theft of United States Treasury checks. The defendant had been convicted under 18 U.S.C. § 641 of knowingly receiving a stolen check with the intent to convert it to his own use, and was sentenced to eighteen months' imprisonment. He argued that he should have been charged under 18 U.S.C. § 510, which provides for lesser, misdemeanor penalties, because it was enacted later than Section 641 and expressly addressed crimes involving Treasury checks whereas the earlier statute spoke only in general terms of "any record, voucher, money, or thing of value of the United States." *Id.* at 459. We rejected that contention, noting that we could draw no inference of congressional intent to restrict a general statute merely from the subsequent enactment of a more specific one carrying a lighter penalty. Indeed, we concluded that the two statutes provided two means of prosecution, "either of which a prosecutor may select and charge for the same conduct." *Id.*[1]

---

1. In support of his contention that subsequent enactments can guide interpretation of the Hobbs Act, Stephenson cites *United States v. O'Grady*, 742 F.2d 682, 691 (2d Cir.1984) (en banc), where we stated:

The enactment of 18 U.S.C. § 201(g) in 1962 prohibiting the receipt of gratuities by federal officials is a clear indication that Congress did not believe that the Hobbs Act prohibits such conduct. To expand the Hobbs Act's coverage beyond that intended by Congress oversteps the proper role of the judiciary.

The reference is inapposite. In *O'Grady* we discussed a substantive prerequisite of the Hobbs Act: whether "inducement" is required to sustain a prosecution under the Act. Because

Stephenson's position is also at odds with the expressed policy favoring a broad interpretation of the Hobbs Act within the confines of its statutory language. "Our examination of the statutory language and the legislative history of the Hobbs Act impels us to the conclusion that Congress intended to make criminal all conduct within the reach of the statutory language." *United States v. Culbert,* 435 U.S. 371, 380, 98 S.Ct. 1112, 1117, 55 L.Ed.2d 349 (1978). The Court in *Culbert* refused to read an implied requirement of "racketeering" into the Act, concluding from the legislative history that "the proponents of the bill [that became the Act] steadfastly maintained that the purpose of the bill was to prohibit robbery and extortion *perpetrated by anyone." Id.* at 377, 98 S.Ct. at 1115 (emphasis added). Referring to the legislative history, the Court continued:

> [N]one of the comments supports the conclusion that Congress did not intend to make punishable all conduct falling within the reach of the statutory language. To the contrary, the debates are fully consistent with the statement in the report of the House Committee on the Judiciary that the purpose of the bill was "to prevent anyone from obstructing, delaying, or affecting commerce ... by robbery or extortion...."

*Id.,* quoting H.R.Rep. No. 238, 79th Cong., 1st Sess., 9 (1945). It is true that in *Culbert* the Court addressed a different Hobbs Act issue than that which we face here. The Court made clear nonetheless that the Act must be read strictly according to its plain language. Just as Congress would have provided for a "racketeering" requirement had it intended one, 435 U.S. at 378 n. 9, 98 S.Ct. at 1116 n. 9, so too would it have excluded federal officials from the dictates of "under color of official right" had it meant to do so.

Far from holding that Congress was engaged in a "meaningless act" in enacting Section 872 in light of the Hobbs Act, we

hold that Congress thereby afforded prosecutors a choice of two statutes, each with its own prerequisites and penalties, with which to combat extortion by federal officials.

## B. *The False Statement Conviction*

█ Stephenson was convicted under 18 U.S.C. § 1001 of making a false statement to a government official when he reported that Chang, the Zamax vice president, had offered Stephenson a bribe. He argues that the conviction must be vacated because the statement was literally true, even though it was meant to conceal his own initiation of the bribery scheme.

> Section 1001 provides, in pertinent part: Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willingly falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations

shall be imprisoned up to five years and fined up to $10,000. Judge Stewart charged the jury that it could convict Stephenson either by finding that he made false statements and representations or, alternatively, that he "falsified, concealed, or covered up" his unlawful acts by "initiating contact" with Agent Dubensky and accusing Chang of offering a bribe. On the latter theory, Judge Stewart cautioned that the falsification, concealment or cover-up "must be accomplished by some affirmative trick, scheme or device.... [M]ere nondisclosure of a material fact without more would be insufficient...."

Stephenson argues that "literally true" statements cannot be the basis of a Section 1001 conviction. *See United States v. Vesaas,* 586 F.2d 101, 104 (8th Cir.1978); *United States v. Lozano,* 511 F.2d 1, 5 (7th Cir.), *cert. denied,* 423 U.S. 850, 96 S.Ct. 94, 46 L.Ed.2d 74 (1975); *United States v. Diogo,* 320 F.2d 898, 905 (2d Cir.1963); *see*

---

we concluded that inducement is required—i.e., the mere receipt of benefits and gratuities by an official is not enough to constitute extortion under color of official right—we cited Section 201(g) to make the point that another statute

covered the cases where officials merely receive benefits but do nothing more. In contrast, the parties in this case concede that Stephenson's substantive conduct would violate either the Hobbs Act or Section 872.

*also Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). But the jury could and did find that his statements were plainly false. On December 1, 1987, Stephenson spoke by telephone with Dubensky and, according to Dubensky, "said that he had received a bribe offer from a company in New York by the name of Zamax." Under *Diogo,* a court looks to the meaning of the statement intended by the defendant, *see* 320 F.2d at 905, but need not accept as conclusive what the defendant purports in court as the statement's intended meaning. *See id.* at 907. Based upon the evidence, the jury easily could have found that by his statement to Dubensky, Stephenson intended to communicate that he was an unwilling victim of a bribery scheme initiated and orchestrated by Chang. So construed, the statement becomes clearly false, and Stephenson's argument fails.

Even if Stephenson's statement were construed to be "literally true," however, the jury still could have found that he misrepresented and concealed what had occurred. Stephenson argues that he cannot "willfully conceal" anything that he has no duty to disclose, and that the fifth amendment precludes his being forced to reveal it. This skirts the essential issue: whether Stephenson "knowingly and willingly falsifie[d], conceal[ed] or cover[ed] up" under Section 1001. From the record it is apparent that the jury could well have found that Stephenson initiated the contacts with Dubensky and the other Commerce Department officials with whom he spoke to deflect suspicion from himself after he learned that the FBI was investigating his activities. He was not simply reporting his conversation with Chang to Dubensky; he was actively seeking to mislead Dubensky, a federal official, into believing that Chang, and not he, was responsible for the attempted bribery. There was ample evidence for the jury to find that Stephenson had falsified, concealed or covered up the fact of his solicitation of a bribe, in clear violation of Section 1001.

## C. *Venue*

■ Stephenson argues that venue was improper in the Southern District of New York. Venue lies "in a district in which the offense was committed." Fed.R.Crim.P. 18. But offenses committed in more than one district "may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). The Government bears the burden of proving by a preponderance of the evidence that venue was proper as to each count. *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1188 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). We consider venue with regard to each of the three offenses of which Stephenson was convicted.

■ *1. The Bribery Conviction* The Government argues that Stephenson's bribery conviction was based on "continuing acts" that occurred both in Washington D.C. and Manhattan, making venue proper in either the District of Columbia or the Southern District of New York under Section 3237(a). Although Stephenson was not physically present in the Southern District, the Government argues that he "reached into New York" by his phone conversations with Chang and Yeh, who were present in New York.

These telephone conversations were crucial components of, not merely preparatory to, the bribery scheme that culminated in the November 19 meeting in Washington, D.C. We reach this conclusion by examining the "key verbs" that "define the criminal offense in the statute." *United States v. Chestnut,* 533 F.2d 40, 46–47 (2d Cir.), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976). Section 201 provides for punishment of any federal official who "corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value" in exchange for exercising influence related to his or her official duties. 18 U.S.C. § 201(b)(2). Stephenson could have done none of these things without entering, by telephone, the Southern District, where his bribery targets conducted business. Central to the scheme were Stephenson's exaggeration of the seriousness of the deficiencies in Zamax's applica-

tion and his dire predictions that Chang and Zeh would be prosecuted, which were designed to make Zamax so anxious to obtain Stephenson's "help" that its officers would be willing to pay him a bribe. Unlike the situation in *Beech–Nut*, where we held that the defendant's phone calls to the Eastern District of New York were "merely preparatory" to the charged offense of introducing adulterated food into interstate commerce, 871 F.2d at 1190–91, Stephenson's calls to New York were part and parcel of the offense of "demand[ing]," "seek[ing]," and "agree[ing] to receive" a bribe from Zamax.

*2. The Hobbs Act Conviction* Venue under the Hobbs Act is proper in any district where interstate commerce is affected or where the alleged acts took place. *United States v. Reed,* 773 F.2d 477, 482 (2d Cir.1985). Stephenson does not dispute that the alleged acts affected interstate commerce in New York.

*3. The False Statement Conviction* Venue under Section 1001 lies where the false statement was completed. We have held that in cases involving false written statements, venue lies where the report is prepared or filed. *See, e.g., United States v. Mendel,* 746 F.2d 155, 165 (2d Cir.1984), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985); *United States v. Candella,* 487 F.2d 1223, 1227–28 (2d Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974). The same principle applies here to the telephonic statements. Stephenson concedes that Agent Dubensky was in New York at the time of their conversation, during which Stephenson made the allegedly false comments. Although the statement was uttered in the District of Columbia, it was "filed" in New York when Dubensky received it.

*4. The Motion to Transfer* The denial of a motion to transfer under Fed.R. Crim.P. 21(b) is erroneous only if the district judge commits an abuse of discretion. *United States v. Keuylian,* 602 F.2d 1033, 1038 (2d Cir.1979). Stephenson argues that even if venue lay in the Southern District, it was an abuse of discretion for Judge Stewart to deny his motion to transfer to the District of Columbia. In ruling on a Rule 21(b) motion, a court should consider a variety of factors, the most important of which for our purposes are: (a) inconvenience and expense to the parties; and (b) the location of parties, witnesses, counsel, events in issue, and necessary documents and records. *See id.* It remains for the court to try to strike a balance and determine which factors are of greatest importance. *See* 2 C. Wright, *Federal Practice and Procedure: Criminal* § 344, at 275 (2d ed. 1982). Although Stephenson points to several considerations favoring the District of Columbia as a more convenient forum, the residences of a number of Government witnesses and the location of the prosecutor and the documents and tape recordings relevant to the case against Stephenson favored holding the trial in the Southern District. The district court did not abuse its discretion in denying the Rule 21(b) motion.

### D. *The Sentence*

Judge Stewart imposed concurrent sentences of thirty-eight months' imprisonment for each of the three counts on which Stephenson was convicted. Stephenson challenges the sentence on several grounds. He argues, first, that Judge Stewart erroneously sentenced him on both Hobbs Act extortion and bribery, each of which was based on the same acts; second, that Judge Stewart improperly increased the sentence by considering the $100,000 Stephenson allegedly received from C.H. International even though he was acquitted of the charge based on this evidence; and third, that Judge Stewart erroneously concluded, based on Stephenson's financial disclosure to the court, that he had obstructed justice by making materially false statements. The Government cross-appeals by challenging Judge Stewart's refusal to increase the sentence based on Stephenson's allegedly "sensitive" position in the Commerce Department.

*1. Dual Punishment* Contrary to Stephenson's contention, punish-

ment for the same acts under different statutes is constitutionally permissible unless Congress intended otherwise. *See Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *United States v. Walsh,* 700 F.2d 846, 856 (2d Cir.), *cert. denied,* 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983). In discerning congressional intent, we look first to the language of the statutes and whether they expressly authorize different punishments, next to whether the offenses require proof of different facts, and finally to the available legislative history. *United States v. Marrale,* 695 F.2d 658, 662 (2d Cir.1982), *cert. denied,* 460 U.S. 1041, 103 S.Ct. 1434, 75 L.Ed.2d 793 (1983). Here, the two statutes plainly provide for different punishments. The Hobbs Act authorizes up to twenty years' imprisonment and a $10,000 fine, while Section 201(b) allows up to fifteen years' imprisonment, a fine of up to three times the amount of the bribe, and disqualification from service as a federal official. Each statute also contains a factual prerequisite the other does not: The Hobbs Act requires proof that the extortionate acts affect interstate commerce, and Section 201 requires that the public official receive the bribe in exchange for "being influenced" or "induced" in the performance of public duties. Further, there is no legislative history indicating an intent to proscribe dual punishment under these two statutes. Judge Stewart properly sentenced Stephenson on both the Hobbs Act and Section 201 convictions, even though they were based on the same acts.

*2. Consideration of the Acquitted Offense* Stephenson was convicted for the Zamax bribe under both the Hobbs Act and 18 U.S.C. § 201(b)(2). Under the Sentencing Guidelines, each of those offenses carries a base offense level of 10. However, despite Stephenson's acquittal on Count One, which charged that he had conspired to commit bribery by his receipt of a $100,000 payment from CHI, Judge Stewart found, "by a preponderance of the evi-

dence, that the $100,000 bribe alleged in Count One occurred." Taking that evidence into account, Judge Stewart increased Stephenson's offense level from 10 to 20.

From the transcript of the sentencing hearing, it is unclear whether Judge Stewart assigned this increased offense level either by finding that the CHI scheme was "relevant conduct" to the Zamax scheme under Section 1B1.3, or as part of an upward departure under Section 3553(b) of the Sentencing Reform Act, 18 U.S.C. §§ 3551 *et seq.* Either rationale—"relevant conduct" or upward departure—is faulty.

▮ As both Stephenson and the Government agree, the CHI bribery activity is not, according to the Guidelines definition of the term, "relevant conduct" to the Zamax offense, and thus it could not properly be considered in the sentencing for that offense. Section 1B1.3, entitled "Relevant Conduct (Factors that Determine the Guideline Range)," provides that the Guideline range shall be determined, in part, "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." Section 3D1.2 requires grouping for all counts "involving substantially the same harm." This section goes on to exclude offenses covered by Guidelines Section 2C1.1—relating to bribery and extortion—from the list of offenses "involving substantially the same harm." Since grouping is thus not required for bribery offenses, such as the CHI scheme, evidence of these offenses is excluded from "relevant conduct" under Section 1B1.3. Additionally, paragraph six of the Commentary to Section 2C1.1 states that "when multiple counts are involved, each bribe is to be treated as a separate, unrelated offense *not subject to § 3D1.2(d) or § 3D1.3(b)*" (emphasis added).[2]

▮ Recognizing that the CHI scheme could not properly be considered "relevant conduct," the Government argues instead

---

**2.** Like the parties, we reach this conclusion on the basis of the Guidelines in effect as of oral argument. Subsequent changes in the Guidelines, effective November 1, 1989, removed Sec-

tion 2C1.1 offenses from the list of those *excluded* from grouping under Section 3D1.2 to the list of those *included.* The comment in paragraph six was also eliminated.

that the district court could have considered the activity in fashioning an upward departure from the Guidelines offense level. Under 18 U.S.C. § 3553(b), the sentencing court may impose a sentence outside the Guidelines range if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission...." Sentencing judges have " 'wide discretion' " in "determining what circumstances to take into account in deciding whether to depart from the guidelines." *United States v. Sturgis*, 869 F.2d 54, 56 (2d Cir.1989), quoting *United States v. Correa–Vargas*, 860 F.2d 35, 37 (2d Cir.1988). If we were to construe as a departure Judge Stewart's consideration of the alleged bribes for which Stephenson was acquitted, such a departure would not comply with 18 U.S.C. § 3553(c)(2), which requires the judge to state "the specific reason for the imposition of a sentence different from" what the Guidelines would prescribe. At the sentencing hearing, Judge Stewart stated, with respect to the CHI scheme:

> Defendant also contends that the court should not consider the conduct alleged in Count One because of the acquittal to that count.
>
> I found, however, by a preponderance of the evidence, that the $100,000 bribe alleged in Count One occurred.

If indeed this were deemed to constitute an upward departure, it would not articulate sufficient reasons to support a departure under the Guidelines. *United States v. Cervantes*, 878 F.2d 50, 54 (2d Cir.1989).

Accordingly, whether the district court increased the offense level on the basis of "relevant conduct" or an upward departure, we must vacate the sentence and remand for resentencing.[3]

### 3. Upward Departure Based on Stephenson's Misrepresentations to the Probation Department

Judge Stewart imposed a two-point upward departure based on the Probation Department's conclusion that Stephenson willfully misrepresented his financial condition. Specifically, the Department found that Stephenson, in his presentencing financial disclosure, had failed to disclose his unrecorded interest in substantial assets, including real estate, stocks, and insurance policies. Unlike the court's consideration of the CHI activity, which did not reveal whether it was making an upward departure, the court here explicitly stated, after addressing the misrepresentations, that it was fashioning an upward departure, and it clearly articulated the reasons therefor. Judge Stewart did not abuse his discretion in imposing the sentence in accord with an upward departure here.

### 4. Failure to Depart Based on Stephenson's "Sensitive" Position

The Government argues, in its cross-appeal, that Judge Stewart erred by not fashioning an upward departure based on Stephenson's allegedly "sensitive" position in the Commerce Department. The Government relies on Guideline 2C1.1(b)(2), which provides for an eight-level increase "[i]f the offense involved a bribe for the purpose of influencing ... any official holding a high level decisionmaking or sensitive position." While the section does not define such a position, the Commentary provides a list of examples, including "prosecuting attorneys, judges, agency administrators, supervisory law enforcement officers, and other governmental officials with similar levels of responsibility." Referring to this last clause, the Government argues that Stephenson's position affected national security and involved significant supervisory duties as it required him to evaluate applications for licenses to export high-technology equipment to the Soviet Union and China, among other countries.

Although we agree with the Government that this issue presents a question of law

---

**3.** Because we find that the district court's consideration of the alleged bribes for which Stephenson was acquitted does not comply with the provisions governing relevant conduct and sentencing departures, we do not address the question whether a court may consider conduct subject to an acquittal in fashioning a Guidelines sentence, an issue similarly left open by an earlier panel of this court in *United States v. Bedoya*, 878 F.2d 73, 76 (2d Cir.1989) (per curiam).

reviewed *de novo,* we agree with Judge Stewart that Stephenson did not fall within Guideline 2C1.1(b)(2). The Commentary to Guideline 2C1.1(b)(2) underscores to us the Sentencing Commission's intent that the provision apply to corruption by officials sitting in high positions of public trust. That Stephenson's duties involved some degree of discretion and required him to possess a security clearance does not set him apart from a multitude of personnel in the federal service. Because the Guidelines afford courts generous leeway to depart upward when mid-level Government employees such as Stephenson engage in truly egregious breaches of trust, *see Correa–Vargas,* 860 F.2d 35, we think it preferable that courts depart when necessary, instead of straining other Guideline provisions, as the Government urges here.

### III.

In sum, we affirm Stephenson's conviction but vacate the sentence and remand for resentencing after further findings by the district court regarding its consideration of the alleged CHI bribery scheme.

Conviction affirmed; remanded for resentencing.