Lisa Margaret Smith, Asst. U.S. Atty., U.S. Attys. Office, White Plains, NY, for plaintiff.

Stephen R. Lewis, Stephens, Buderwitz, Baroni, Reilly & Lewis, White Plains, NY, for defendant.

### Conclusion

For the reasons set forth above, Moran's Rule 56 motion for an order granting summary judgment against the plaintiff Bodden is denied.

It is so ordered.

**UNITED STATES of America**

v.

**Douglas John KNIGHT, a/k/a Justin Knight, Defendant.**

**No. 93 Cr. 126 (CLB).**

United States District Court,
S.D. New York.

June 4, 1993.

### MEMORANDUM AND ORDER

BRIEANT, District Judge.

By indictment filed in this district on March 2, 1993, the Grand Jury charged Douglas John Knight, a/k/a Justin Knight, and others unknown, with four separate counts. Count 1 charges Knight, and others unknown, between February 17, 1993 and February 24, 1993, in this district and elsewhere, "unlawfully, wilfully and knowingly did attempt to obstruct, delay and affect commerce by extortion, to wit, the defendant demanded payment of $350,000, and subsequently $450,000, from Pepsico, and threatened that he would tamper with products and would advertise such tampering, if the money was not paid", in violation of § 1951(a) of Title 18 of the United States Code.

Count 2, arising out of the same transaction, charges defendant Knight, and others unknown, with having threatened to "tamper with a consumer product that affects interstate and foreign commerce, to wit, the defendant demanded payment of $350,000 and subsequently $450,000, from Pepsico and threatened that he would tamper with products, and would advertise such tampering, if the money was not paid", in violation of § 1365(d) of Title 18 of the United States Code.

Count 3, arising out of the same transaction, charges that Knight, and others unknown, "with the intent to extort money.... from Pepsico, a corporation, transmit in interstate commerce communications containing threats to injure the property and reputation of Pepsico, to wit, in letters and telephone calls the defendant demanded payment of $350,000, and subsequently $450,000, from Pepsico, and threatened that he would tamper with products and would advertise such tampering if the money was not paid", in violation of § 875(d) of Title 18 of the United States Code.

Count 4 reads as follows:

"On or about February 24, 1993, in the Southern District of New York and elsewhere, DOUGLAS JOHN KNIGHT, a/k/a JUSTIN KNIGHT, the defendant, and others unknown to the Grand Jury, unlawfully, wilfully and knowingly did, in the United States, knowingly engage and attempt to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, to wit, the defendant did purchase a cashier's check for $41,500 at the United Missouri Bank, using money which was a portion of the proceeds of a check which the defendant knew had been obtained by threats to injure the property and reputation of Pepsico, which threats were communicated through interstate commerce. (Title 18, United States Code, § 1957)"

By motion filed April 30, 1993, and heard by the Court on May 26, 1993, defendant moved pursuant to Fed.R.Crim.P. Rules 18 and 21(b) for an order transferring the case in its entirety to the Western District of Missouri. Other relief, including suppression of evidence, was sought, but on consent of both parties no hearing was held on the balance of the motion pending a decision on the issue of venue.

The defendant argues that the fourth count, the alleged violation of § 1957 of Title 18 of United States Code entitled "Engaging in monetary transactions and property derived from specified unlawful activity", a sort of junior type of money laundering, took place solely in the Western District of Missouri, and that venue is not constitutionally permissible in this district as to Count 4. He also urges that once it appears that this Court must transfer the fourth count to the Western District of Missouri for trial, then in the interests of justice and judicial economy the Court should also transfer the first three counts. This latter contention seems valid, and the Government does not argue to the contrary.

Pepsico is a resident of this district, where it has its principal office. In addition to the harm to Pepsico resulting from the extortion or the threatened tampering of its consumer products, much of the damage to the consumer products would also result in harm to the citizens of this judicial district. This Court, therefore, has a strong interest in trying the case, to assure the protection of the individual and corporate citizens of this district.

It is clear that the first three counts of the indictment could have been charged and tried either in Western Missouri or Southern New York, and substantially all of the witnesses who would testify in connection with Count 4 would also be necessary witnesses either for the Government or the defense in the trial of the first three counts. This overlap in evidence is of no relevance on the issue of constitutional venue. The Court also agrees that the interests of justice for the defendant, and judicial economy, require one trial and not two trials.

*The Facts Concerning the Crimes Charged*

Most of the Government's evidence in the case is reflected in documents or taped conversations. While the Court has not listened to the tapes, the Court accepts the uncontested representations made in the papers submitted on this motion and relies on the following facts, as set forth in the complaint, the motion papers and at the oral argument. Defendant's attorney describes the facts as bizarre, and this is the understatement of the week.

Mr. Knight is a resident of Kansas City, Missouri. He proffers that he is known by the name of "Justin" only to people on the street scene, in hospitals (where he has been a patient or a volunteer helper), and in gin mills.

On February 18, 1993, a letter in a Federal Express envelope was received by Pepsico at

its corporate headquarters in this district, with an airbill from Kansas City, Missouri, showing as sender one "A.B. Nelson", at a fictitious address in that city. The letter is attached as Exhibit "A" to the verified complaint of Special Agent Mary E. Galligan of the Federal Bureau of Investigation, sworn to before Magistrate Judge Fox of this district on February 23, 1993. This letter is addressed to whom it may concern, and familiarity with the entire letter on the part of the reader is assumed. Essentially, it is a threat. The writer, who did not sign the threatening letter, informed Pepsico that it was "randomly chosen out of numerous large companies that met my requirements, so there is nothing personal directed at your company in any form." It advises in relevant part as follows:

"A short time ago a person that I met not only changed my life, but saved it as well. I personally don't have the means to reward him for it, but I know a wealthy company such as yours could do it for me.

I have. wrote [sic] another letter to this person.... I have included an exact copy of this letter so you know what was said. This person knows nothing about this letter I am writing to you and it is very doubtful he knows who I am."

The letter continues to direct Pepsico to "ship $350,000 in hundred dollar bills to the person on the [Federal Express] airbill I have already filled out. You must use this airbill..... I do not want the indivial[sic] that saved my life to know where it came from, otherwise I'm sure he wouldn't accept it under these terms."

The letter contained a deadline date for shipment, Friday for Saturday delivery, and a threat to tamper with grocery products of Pepsico and to send a copy to major newspapers "with a list of products that should be pulled off the shelves" by Monday, if the extortion demand was not complied with by Saturday. The letter continued:

"when Justin picks up the mail on Saturday he will have no knowledge of this letter or where the cash came from. The only information he will know is what he has read in the letter that was sent to him.

I apologize for having to make this demand, but I find it the only way I can repay my debt to him for changing my life. I know he will use the money in a wise manner. Please let him believe the money came from an unknown friend who wishes to present him with a gift, and not the truth."

The letter continues:

"If this money is not delivered, or Justin is questioned, detained, or forced to give the money back, I will carry out my threat without hesitation.... My life will be ending soon, but Justin's has just began[sic] and I thank you in advance for giving someone the opportunity to make something out of his life that he so deserves."

The letter to Justin Knight, enclosed with the letter to Pepsico, and attached as Exhibit "B" to the complaint, reads as follows:

"Justin Knight

5054 Main Street

Suite 730

Kansas City, MO 64112

Dear Justin,

It is doubtful that you remember me and perhaps that is just as well. A short time ago you took the time to speak with me about problems that no one else cared to do so. My life has changed because of our conversion[sic] even though you probably haven't a clue who I am.

You are a very bright person for your age and I wish you all the success the world has to offer. If all goes as planned, you can expect a gift from me in the mail Saturday. Promise me that you will use your best judgement with it and live the life you so well deserve. I will not be around much longer to see the results of your accomplishments, but I know in my heart that you will do what is best.

A Grateful Friend"

The letter did not contain the airbill, said therein to have been enclosed, which Pepsico had been admonished to use as the sole permissible means of transmitting the extorted money.

With the aid of FBI agents, the Vice-President, Associate General Counsel and Assistant Secretary of Pepsico, Lawrence Dickie, wrote to Justin Knight at the address

set forth in the extortion letter and sent that response Federal Express from Elmsford, New York, in this district, to Mr. Knight in Kansas City. This letter is attached to the complaint as Exhibit "C", expresses a willingness to pay, and observes that there was no airbill enclosed.

The address for Justin Knight, furnished by the extortionist, was a mailbox at a concern in Kansas City known as Tender Sender, which provides a mailbox rental service. This mailbox was registered to the name of "Douglas Knight" and three other named persons, doing business as "Historical Data", located at 4615 Broadway in Kansas City, Missouri.

Mr. Knight picked up the letter complaining about the omission of the airbill enclosure, Exhibit "C", on *February 19, 1993* at 12:24 Central Standard Time. However, on February 19, 1993, another letter from the extortionist arrived at Pepsico headquarters in this district, via Federal Express. That letter contained the omitted return airbill addressed to Justin Knight at the office of Tender Sender, and had been sent from Kansas City by Federal Express on February 18, 1993, the day before receipt by Knight of Exhibit "C". It advises Pepsico again that "Justin doesn't know where or how the cash was delivered to him", and renews the threat. The extortionist also advises, "I may be in contact with Justin either by voice or mail in the future."

Thereafter, Mr. Knight followed a pattern of behavior in which he made no effort to conceal his identity or participation. On February 19, 1993, he telephoned Lawrence Dickie and identified himself as Douglas Knight, said that he had been known sometimes as "Justin Knight", and that he was expecting to receive something.

To make a long story short, after a lengthy charade which a trial jury could consider to be consistent with the existence of an actual person other than Knight himself who was committing the extortion, a corporate check (instead of cash) for $350,000 was issued to Knight by Pepsico and sent, at the telephone request of Knight, not through Tender Sender but directly to Room 702 at a Sheraton

Hotel in Kansas City where Knight was then staying.

Thereafter, events became even more strange. According to Knight's own affidavit, sworn to April 30, 1993 and submitted in support of the motion, on February 24, 1993, Mr. Knight retained one "D", said to be an attorney[1], and as appears from the declaration of Stephen R. Lewis, Esq., on February 24, 1993 the defendant, in company with attorney "D", went to the United Missouri Bank in Kansas City to negotiate Pepsico's check. This lawyer apparently told his client that no insurance is provided to banks by the Federal Deposit Insurance Corporation for account balances in excess of $100,000, and they therefore constructed a transaction with the bank to make three separate deposits of $100,000 each. This attorney, however, if such he was, while cautious enough to foresee the possible failure of a major bank, did not perceive or inform his client of the obvious aura of fraud or fairy tale inherent in the entire transaction. The defendant also purchased a cashier's check for $41,500 at the United Missouri Bank using a portion of the proceeds from Pepsico, and in addition the defendant received $5,000 in cash out of the proceeds of the extortion and paid $700 of this to "D" for his legal advice about the FDIC. When arrested that evening in his hotel room in Kansas City, defendant possessed $4,571, which included funds of his own. A consent search of the safe deposit box at the hotel turned up the cashier's check for $41,500 made out to Douglas Justin Knight. Also in the box was a photocopy of the $350,000 check from Pepsico and three deposit slips for $100,000 each showing new accounts at the United Missouri Bank.

The $350,000 check which constituted the proceeds of extortion had been drawn upon the New York City office of Morgan Guaranty Trust Company. Pepsico had stopped payment on the check. Suspicious of the entire matter, an officer of the United Missouri Bank telephoned the Morgan Bank in New York City to ascertain if the check was good. Erroneously, he was told that if it had two signatures it was good, notwithstanding

---

1. This Court's computer search of the Martindale–Hubbell Law Directory did not disclose the

lawyer, although the FBI seized his professional card from defendant at the time of the arrest.

the existence of the stop order, which was apparently not known to the officer who answered the phone call.

The financial transaction relied on to support the violation alleged in Count 4 of the indictment is the purchase of a cashier's check for $41,500 at the Missouri bank, "using money which was a portion of the proceeds of the check which the defendant knew to have been obtained by threats to injure the property and reputation of Pepsico, which threats were communicated through interstate commerce."

At this point we quote in relevant part § 1957 of Title 18 of the United States Code upon which the fourth count is based:

> § 1957. Engaging in monetary transactions in property derived from specified unlawful activity.
>
> (a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or *attempts* to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b). (Emphasis added)
>
> \*  \*  \*  \*  \*  \*
>
> (d) The circumstances referred to in subsection (a) are—
>
> (1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States; or
>
> \*  \*  \*  \*  \*  \*
>
> (f) As used in this section—
>
> (1) the term "monetary transaction" means the deposit, withdrawal, transfer or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title, but such term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution;
>
> (2) the term "criminally derived property" means any property constituting, or

derived from, proceeds obtained from a criminal offense; and

> (3) the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.

Our analysis of the statute suggests that in order to obtain a conviction on Count 4, the Government must prove to the satisfaction of a trial jury, beyond a reasonable doubt, only that this defendant (i) knowingly and willfully (ii) engaged or attempted to engage in (iii) the purchase of a cashier's check in the amount of $41,500 made out to Douglas Justin Knight (iv) and that the funds used in the purchase of the check were derived from the specified unlawful activity, as alleged in Count 3 of the indictment.

None of the acts of the defendant in performing the elements of the monetary transactions crime took place in the Southern District of New York. However, the trial of Count 4 must, of necessity, include practically all of the evidence which would be relevant in the prosecution or defense at trial of Counts 1 through 3, inclusive, in order to prove the first and fourth elements of Count 4.

The only contact with this jurisdiction which Count 4 has is the purely fortuitous event that the officer of the Missouri bank made a telephone call to the drawee bank in New York. This phone call was not essential, or even foreseeable, when the defendant commenced the crime, and it was not caused or executed in furtherance of the crime. The crime was complete the moment that Knight *attempted* to engage in a monetary transaction by entering the bank premises, presenting Pepsico's check, and asking for the cashier's check. Ultimately, when the Pepsico check passed through the Federal Reserve System and reached the clearing house, it would have wound up in New York. Again, this is purely fortuitous and has no part in the actual commission of the crime. *Cf. United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974).

Our Court of Appeals has established strict standards for venue in criminal cases. In *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181 (2d Cir.), *cert. denied sub nom Lavery v. U.S.,* 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989), the Court considered

the conviction of a large food manufacturing company and certain of its officers and employees for having "foisted off on a confident and credulous public adulterated apple juice for babies"[2] into interstate commerce in violation of 21 U.S.C. § 331(a) and 332(b)(1). The defendants were convicted of selling phony apple juice made from an imported syrup or concentrate which they knew did not contain any apples. The Court of Appeals held:

> "neither Hoyvald nor Lavery [individual defendants and officers of Beech–Nut] was shown to have conducted business from the Eastern District of New York. So far as appears from the record, these defendants were not present in that district … Thus, though Hoyvald and Lavery were shown to have caused the introduction of adulterated juice into interstate commerce, that introduction was not caused by them from the Eastern District [of New York]. Hence, it does not appear that their substantive FDCA offenses were begun, continued, or completed in the Eastern District of New York."

*Id.* at 1189.

The Court in *Beech–Nut* went on to demolish an argument by the Government that "defendants' subordinates (1) telephoned the [food] brokers in the Eastern District of New York to place orders for the synthetic apple juice concentrate and (2) mailed confirmations for these concentrate orders into the Eastern District of New York." This was held to be "not part of the offense … but, merely prior and preliminary to that offense. Whether the crime is continuing or not continuing, venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." *Id.* at 1190.

The situation in *Beech–Nut* is factually indistinguishable from the instant case. The telephone conversations with Pepsico in New York and sending of the correspondence into New York, assuming it was done or aided and abetted by Knight rather than independently by "A.B. Nelson", the "Grateful Friend", (who may well be Knight himself or his confederate), while part of the crimes charged in Counts 1 through 3 were not even preparatory to the offense of purchasing the cashier's check in Kansas City. The crime of purchasing the cashier's check with proceeds known to be the result of an extortion was purely local and instantaneous[3]. Based on *Beech–Nut*, this telephone call to Morgan Guaranty by the Missouri Bank *a fortiori* is insufficient as a matter of law to base venue in this district for Count 4.

It is true that *Beech–Nut* has been criticized and regarded as unduly narrow in its disposition of the venue point. In *United States v. Stephenson*, 895 F.2d 867 (2d Cir. 1990), our Court of Appeals had the opportunity to overrule *Beech–Nut*, but did not do so. Instead, *Beech–Nut* was cited with approval; and then distinguished on the flimsiest of grounds. In *Stephenson*, the Court of Appeals held that defendant "reached into New York" by a phone conversation pointing out the advantages of complying with a request for a bribe which he, a Washington, D.C. based federal bureaucrat, had previously solicited in the District of Columbia. The phone call was held to be "part and parcel of the offense of 'demand[ing],' 'seek[ing],' and 'agree[ing] to receive' a bribe." *Id.*, 895 F.2d at 875. Thereafter, in *United States v. Bilzerian*, 926 F.2d 1285, 1301 (2d Cir.1991), the Court went out of its way to cite *Beech–Nut* with approval, although the rule of *Beech–Nut* would appear to have nothing to do with Bilzerian's case, where venue clearly was controlled by *United States v. Mendel*, 746 F.2d 155 (2d Cir.1984) (Offense of violating § 1001 takes place where a false document is "made" *or* where it is "filed".) *See also United States v. Delia*, 944 F.2d 1010 (2d Cir.1991).

This Court concludes that it must follow *Beech–Nut* until that case is overruled, and accordingly there is no constitutional basis for venue in the Southern District of New York with regard to Count 4.

---

**2.** Quoted from the opinion of Circuit Judge Cardamone in *United States v. Beech–Nut Nutrition Corp.*, 925 F.2d 604, 606 (2d Cir.1991) (Beech–Nut II)

**3.** In *Beech–Nut*, our Court of Appeals declined to determine whether the continuous process of mixing, packing, shipping and selling apple juice for babies with no apples in it was a continuing or non-continuing offense within the meaning of § 3237 of Title 18. *See* p. 1189 of 871 F.2d.

IT IS ORDERED that the motion of defendant for such relief is granted and this entire indictment is transferred for trial to the United States District Court for the Western District of Missouri. In the interests of Justice, this order is stayed for a period of twenty (20) days during which the Government may, if so advised, dismiss Count 4 with prejudice[4], or the parties may effect a disposition by plea of the entire indictment on a waiver of venue. Should there be a disposition or a dismissal of Count 4, within such time period, this Court will vacate the foregoing order. Time is excluded under the Speedy Trial Act in the interests of Justice until the further order of this court or for a reasonable time after said twenty day period within which defendant may be brought before a judicial officer in the transferee Court.

SO ORDERED.

---

**4.** Presumably authority to do so must be sought from the United States Attorney in Western Missouri. *See United States v. Boulier,* 359 F.Supp 165, 170–71 (E.D.N.Y.1972), *aff'd,* 476 F.2d 456 (2d Cir.), *cert. denied,* 414 U.S. 823, 94 S.Ct. 171, 38 L.Ed.2d 56 (1973).