UNITED STATES *v.* CULBERT

No. 77–142. Argued January 11, 1978—Decided March 28, 1978

MARSHALL, J., delivered the opinion of the Court, in which all other Members joined, except BRENNAN, J., who took no part in the consideration or decision of the case.

*Sara Sun Beale* argued the cause for the United States. With her on the brief were *Solicitor General McCree, Assistant Attorney General Civiletti,* and *Deputy Solicitor General Frey.*

*James F. Hewitt* argued the cause for respondent. With him on the brief was *Frank O. Bell, Jr.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Respondent was convicted of violating the Hobbs Act, 18 U. S. C. § 1951 (1976 ed.), which provides in relevant part:

"Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical

violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both." § 1951 (a).

The question in this case is whether the Government not only had to establish that respondent violated the express terms of the Act, but also had to prove that his conduct constituted "racketeering."

The evidence at respondent's jury trial showed that he and an accomplice attempted to obtain $100,000 from a federally insured bank by means of threats of physical violence made to the bank's president. The United States Court of Appeals for the Ninth Circuit, with one judge dissenting, reversed the Hobbs Act conviction,[1] holding that, " 'although an activity may be within the literal language of the Hobbs Act, it must constitute "racketeering" to be within the perimeters of the Act.' " 548 F. 2d 1355, 1357, quoting *United States* v. *Yokley,* 542 F. 2d 300, 304 (CA6 1976). We granted certiorari, 434 U. S. 816 (1977),[2] and we now reverse.

---

[1] Respondent was also convicted of attempted bank robbery, a violation of 18 U. S. C. § 2113 (a) (1976 ed.). In the Court of Appeals, however, the Government confessed error on the ground that § 2113 (a) is not violated unless the taking of the bank's money is "from the person or presence of another." Since respondent's plan involved the delivery of the money by the bank president to a parking lot and did not contemplate any entry by respondent into the bank or any taking from the person or presence of the president, the Government conceded that the bank robbery conviction should be vacated. 548 F. 2d 1355, 1356–1357.

In its brief in this Court, the Government notes that "the United States Attorney's concession was not approved by the Solicitor General and does not represent the position of the Department of Justice on this question." Brief for United States 33 n. 19. We express no view on the validity of the United States Attorney's interpretation of § 2113 (a).

[2] There is a conflict in the Circuits on this issue. Compare *United States* v. *Culbert,* 548 F. 2d 1355 (CA9 1977) (case below), and *United States* v. *Yokley,* 542 F. 2d 300 (CA6 1976), with *United States* v. *Frazier,* 560 F. 2d 884, 886 (CA8 1977), cert. pending, No. 77–847; *United States* v.

## I

Nothing on the face of the statute suggests a congressional intent to limit its coverage to persons who have engaged in "racketeering." To the contrary, the statutory language sweeps within it all persons who have "in any way or degree . . . affect[ed] commerce . . . by robbery or extortion." 18 U. S. C. § 1951 (a) (1976 ed.). These words do not lend themselves to restrictive interpretation; as we have recognized, they "manifest . . . a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence," *Stirone* v. *United States,* 361 U. S. 212, 215 (1960). The statute, moreover, carefully defines its key terms, such as "robbery," "extortion," and "commerce."[3] Hence the absence of any reference to "racketeering"—much less any definition of the word—is strong evidence that Congress did not intend to make "racketeering" an element of a Hobbs Act violation.

*Warledo,* 557 F. 2d 721, 730 (CA10 1977); and *United States* v. *Brecht,* 540 F. 2d 45, 52 (CA2 1976).

[3] Title 18 U. S. C. § 1951 (b) (1976 ed.) provides:

"As used in this section—

"(1) The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

"(3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."

Respondent nevertheless argues that we should read a racketeering requirement into the statute. To do so, however, might create serious constitutional problems, in view of the absence of any definition of racketeering in the statute. Neither respondent nor either of the two Courts of Appeals that have read this requirement into the statute has even attempted to provide a definition. Without such a definition, the statute might well violate "the first essential of due process of law": It would forbid "the doing of an act in terms so vague that [persons] of common intelligence [would] necessarily [have to] guess at its meaning and differ as to its application." *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926); see, *e. g.*, *Hynes* v. *Mayor of Oradell*, 425 U. S. 610, 620 (1976). But we need not concern ourselves with these potential constitutional difficulties because a construction that avoids them is virtually compelled by the language and structure of the statute.

## II

### A

Nothing in the legislative history supports the interpretation of the statute adopted by the Court of Appeals.[4] The predecessor to the Hobbs Act, the Anti-Racketeering Act of 1934, ch. 569, 48 Stat. 979, was enacted, as its name implies, at a time when Congress was very concerned about racketeering activities. Despite these concerns, however, the Act, which was written in broad language similar to the language of the

---

[4] Although we find the statutory language to be clear, we have often stated that, "[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 543–544 (1940) (footnotes omitted). See *Train* v. *Colorado Public Interest Research Group, Inc.*, 426 U. S. 1, 10 (1976); *Cass* v. *United States*, 417 U. S. 72, 77–79 (1974).

Hobbs Act, nowhere mentioned racketeering.[5] This absence of the term is not surprising, since the principal congressional committee working on the Act, known as the Copeland Committee, found that the term and the associated word "racket" had "for some time been used loosely to designate every conceivable sort of practice or activity which was either questionable, unmoral, fraudulent, or even disliked, whether criminal or not." S. Rep. No. 1189, 75th Cong., 1st Sess., 2 (1937).[6]

The Copeland Committee proceeded to develop its own "working definition" of racketeering, but it did not incor-

---

[5] The Anti-Racketeering Act provided in pertinent part:

"SEC. 2. Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—

"(a) Obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable considerations, or the purchase or rental of property or protective services, not including, however, the payment of wages by a bona-fide employer to a bona-fide employee; or

"(b) Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right; or

"(c) Commits or threatens to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate sections (a) or (b) ; or

"(d) Conspires or acts concertedly with any other person or persons to commit any of the foregoing acts; shall, upon conviction thereof, be guilty of a felony and shall be punished by imprisonment from one to ten years or by a fine of $10,000, or both.

"SEC. 3. (a) As used in this Act the term 'wrongful' means in violation of the criminal laws of the United States or of any State or Territory.

"(b) The terms 'property', 'money', or 'valuable considerations' used herein shall not be deemed to include wages paid by a bona-fide employer to a bona-fide employee."

[6] Although the cited report was issued in 1937, it was intended to provide "a complete picture" of the earlier work of the Copeland Committee. S. Rep. No. 1189, 75th Cong., 1st Sess., 1 (1937).

porate this definition into the Act. *Ibid.* Critical to the definition was the existence of "an organized conspiracy to commit the crimes of extortion or coercion." *Id.,* at 3. Yet the Act itself did not require a conspiracy to engage in unlawful conduct, and the Senate Judiciary Committee Report expressly stated that a violation of the Act would be established " 'whether the restraints [of commerce] are in form of conspiracies or not,' " S. Rep. No. 532, 73d Cong., 2d Sess., 2 (1934), quoting Justice Department memorandum; see H. R. Rep. No. 1833, 73d Cong., 2d Sess., 2 (1934). Moreover, the Act included a separate prohibition on conspiracies, § 2 (d), 48 Stat. 980; see n. 5, *supra,* that would have been superfluous if proof of racketeering—as defined by the Copeland Committee to require conspiracy—were an integral element of the substantive offenses.[7] There is nothing in the legislative history to dispel the conclusion compelled by these observations. Congress simply did not intend to make racketeering a separate, unstated element of an Anti-Racketeering Act violation.

## B

Given the absence of this intent in the Hobbs Act's predecessor, any requirement that racketeering be proved must be derived from the Hobbs Act itself or its legislative history. While the Hobbs Act was enacted to correct a perceived deficiency in the Anti-Racketeering Act, that deficiency had nothing to do with the element of racketeering. See *United States* v. *Enmons,* 410 U. S. 396, 401–404 (1973). Rather, it involved the latter Act's requirement that the proscribed "force, violence or coercion" lead to exaction of "valuable consideration" and its exclusion of wage payments from the definition of consideration. See n. 5, *supra.* In construing the wage-payments exclusion, this Court had held that the Act

---

[7] The Hobbs Act also separately proscribes conspiracies. 18 U. S. C. § 1951 (a) (1976 ed.), quoted, *supra,* at 371–372.

did not cover the actions of union truckdrivers who exacted money by threats or violence from out-of-town drivers in return for undesired and often unutilized services. *United States* v. *Teamsters,* 315 U. S. 521 (1942). Shortly thereafter, several bills were introduced in Congress to alter this result. *United States* v. *Enmons, supra,* at 402, and n. 8.

The bill that eventually became the Hobbs Act deleted the exception on which the Court had relied in *Teamsters* and substituted specific prohibitions against robbery and extortion for the Anti-Racketeering Act's language relating to the use of force or threats of force. The primary focus in the Hobbs Act debates was on whether the bill was designed as an attack on organized labor. Opponents of the bill argued that it would be used to prosecute strikers and interfere with labor unions. See, *e. g.,* 91 Cong. Rec. 11848 (1945) (remarks of Rep. Lane); *ibid.* (remarks of Rep. Powell); *id.,* at 11902 (remarks of Rep. Celler). The proponents of the bill steadfastly maintained that the purpose of the bill was to prohibit robbery and extortion perpetrated by anyone. See, *e. g., id.,* at 11900 (remarks of Rep. Hancock); *id.,* at 11904 (remarks of Rep. Gwynne); *id.,* at 11912 (remarks of Rep. Hobbs); *id.,* at 11914 (remarks of Rep. Russell). Although there were many references in the debates to "racketeers" and "racketeering," see, *e. g., id.,* at 11906 (remarks of Rep. Robsion); *id.,* at 11908 (remarks of Rep. Vursell); *id.,* at 11910 (remarks of Rep. Andersen), none of the comments supports the conclusion that Congress did not intend to make punishable all conduct falling within the reach of the statutory language. To the contrary, the debates are fully consistent with the statement in the Report of the House Committee on the Judiciary that the purpose of the bill was "to prevent anyone from obstructing, delaying, or affecting commerce, or the movement of any article or commodity in commerce by robbery or extortion *as defined in the bill.*" H. R. Rep. No. 238, 79th Cong., 1st Sess., 9 (1945) (emphasis

added); see also S. Rep. No. 1516, 79th Cong., 2d Sess., 1 (1946).[8]

Indeed, many Congressmen praised the bill because it set out with more precision the conduct that was being made criminal. As Representative Hobbs noted, the words robbery and extortion "have been construed a thousand times by the courts. Everybody knows what they mean." 91 Cong. Rec. 11912 (1945). See also *id.*, at 11906 (remarks of Rep. Robsion); *id.*, at 11910 (remarks of Rep. Springer); *id.*, at 11914 (remarks of Rep. Russell). In the wake of the Court's decision in *Teamsters*, moreover, a paramount congressional concern was to be clear about what conduct was prohibited:

> "We are explicit. That language is too general, and we thought it better to make this bill explicit, and leave nothing to the imagination of the court." 91 Cong. Rec. 11904 (1945) (remarks of Rep. Hancock).

See *id.*, at 11912 (remarks of Rep. Hobbs).

It is inconceivable that, at the same time Congress was so concerned about clearly defining the acts prohibited under the bill, it intended to make proof of racketeering—a term not mentioned in the statute—a separate prerequisite to criminal liability under the Hobbs Act.[9]

---

[8] There are other indications that Congress did not intend to make criminal liability under the Hobbs Act turn on proof of some additional element of "racketeering." One Congressman, in enumerating for his colleagues exactly what the Government would have to prove to establish an individual's liability under the bill, made no reference to "racketeering." 91 Cong. Rec. 11903 (1945) (remarks of Rep. Gwynne). Another emphasized that, with respect to a predecessor bill—one that "was substantially carried forward into the [Hobbs] Act," *United States* v. *Enmons*, 410 U. S. 396, 404–405, n. 14 (1973)—Congress was "trying to make a legal definition of racketeering" by proscribing specific conduct in the statute. 89 Cong. Rec. 3227 (1943) (remarks of Rep. Vorys).

[9] We note that when Congress wanted to make racketeering an element of an offense, it knew how to do so. In the Organized Crime Control Act

## III

We therefore conclude that respondent's position has no support in either the statute or its legislative history. Respondent also invokes, as did the court below, two maxims of statutory construction, but neither is applicable here. It is true that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *Rewis* v. *United States,* 401 U. S. 808, 812 (1971), and that, "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance," *United States* v. *Bass,* 404 U. S. 336, 349 (1971). But here Congress has conveyed its purpose clearly, and we decline to manufacture ambiguity where none exists. The two maxims only apply "when we are uncertain about the statute's meaning"; they are "not to be used 'in complete disregard of the purpose of the legislature.'" *Scarborough* v. *United States,* 431 U. S. 563, 577 (1977), quoting *United States* v. *Bramblett,* 348 U. S. 503, 510 (1955).

With regard to the concern about disturbing the federal-state balance, moreover, there is no question that Congress intended to define as a federal crime conduct that it knew was punishable under state law. The legislative debates are replete with statements that the conduct punishable under the Hobbs Act was already punishable under state robbery and extortion statutes. See, *e. g.,* 91 Cong. Rec. 11848 (1945) (remarks of Rep. Powell); *id.,* at 11900 (remarks of Rep. Hancock); *id.,* at 11904 (remarks of Rep. Gwynne). Those who opposed the Act argued that it was a grave interference with the rights of the States. See, *e. g., id.,* at 11903 (remarks

of 1970, Pub. L. 91–452, 84 Stat. 922, Congress not only made "racketeering activity" an element of a statutory offense, but it specifically defined the term for purposes of the statute. 18 U. S. C. § 1961 (1) (1976 ed.). Moreover, the statute defines as "racketeering activity" any act which violates certain state laws as well as "any act which is indictable under . . . title 18, United States Code . . . section 1951"—the Hobbs Act. § 1961 (1) (B).

of Rep. Welch); *id.,* at 11913 (remarks of Rep. Resa). Congress apparently believed, however, that the States had not been effectively prosecuting robbery and extortion affecting interstate commerce and that the Federal Government had an obligation to do so. See, *e. g., id.,* at 11911 (remarks of Rep. Jennings); *id.,* at 11904, 11920 (remarks of Rep. Gwynne).

Our examination of the statutory language and the legislative history of the Hobbs Act impels us to the conclusion that Congress intended to make criminal all conduct within the reach of the statutory language. We therefore decline the invitation to limit the statute's scope by reference to an undefined category of conduct termed "racketeering." The judgment of the Court of Appeals is, accordingly,

*Reversed.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.