**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Fred CHEIMAN and Nick Sardelis, Defendants-Appellees.**

No. 77–5174.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 5, 1977.

Decided June 26, 1978.

James K. Robinson, U. S. Atty., Detroit, Mich., John L. Newcomer, Sp. Atty., Detroit Strike Force, Detroit, Mich., Patty Ellen Merkamp, c/o T. George Gilinsky, Washington, D. C., for plaintiff-appellant.

Norman L. Lippitt, Warren J. Perlove, Lippitt, Harrison, Perlove, Friedman & Zack, Southfield, Mich., for defendants-appellees.

Before WEICK, CELEBREZZE and MERRITT, Circuit Judges.

MERRITT, Circuit Judge.

The defendants were convicted of violating the 1968 Act prohibiting "extortionate credit transactions," 18 U.S.C. §§ 891–896, by threatening another with bodily harm for the purpose of collecting a false claim of indebtedness. The District Court set aside the jury verdict on grounds that the case "does not come within the class of activity Congress sought to prohibit," and the government appeals.

The principal question on appeal is whether the government must prove that the defendants not only violated the express terms of the extortion statute but were also engaged in "loansharking" or "organized crime." We reverse on grounds that proof of loansharking or organized criminal activity is not a necessary element of the crime and that the proof was sufficient to establish that the defendant violated the express terms of the statute.

## I. STATEMENT OF CASE

### A. The Purpose of the Act

The Congressional purpose of the act proscribing "extortionate credit transactions," 18 U.S.C. §§ 891–896, was to enable federal authorities to strike at loansharking activities carried on by organized crime, and one of the bills considered in the House specifically limited its application to loansharking.[1] But Congress was unable to formulate an effective definition of "loansharking." One proposal defined "loansharking" as an attempt to collect loans which are usurious under state law, but others pointed out that legal interest rates vary widely from state to state while some states have no usury laws at all.[2] Finally, the Senate-House Conference Committee scrapped the idea altogether in favor of the more broadly worded, present version of the statute which makes no mention of loansharking.[3] Throughout the legislative process, however, the proponents of the bill continued to tout the bill as a much needed weapon to fight loansharking by organized crime.[4]

Rather than attempting to define particularly those crimes and criminals at which the bill was aimed, Congress in the final version of the Act outlaws three general kinds of extortion:

1. An "extortionate extension of credit," defined as an "extension of credit" which the creditor and the debtor "understand" may be collected by "the use of violence or other criminal means to cause harm to the person, reputation or property of any person." 18 U.S.C. §§ 891(6), 892.

2. An "advance" of money to another person for use in financing "extortionate extensions of credit." 18 U.S.C. § 893.

3. An "attempt to collect" any debt or claim, "whether acknowledged or disputed, valid or invalid, and however arising" by using "any extortionate means," which is defined as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. §§ 891(1), (6), 894.

The text of the Act does not require proof of loansharking nor does it require any showing that the defendant's conduct in

---

1. 114 Cong.Rec. 1605–1606 (1968).

2. 114 Cong.Rec. 1608–1609 (1968).

3. 114 Cong.Rec. 1609–1610 (1968).

4. *See Perez v. United States,* 402 U.S. 146, 149, 155–156, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).

some way affected or involved interstate commerce. Congress found, rather, that extortion, by its very nature, affects interstate commerce, making every incident of extortion a federal offense because, "Even where extortionate credit transactions are purely intrastate in character they nevertheless directly affect interstate and foreign commerce."[5] Section 894, under which defendants were prosecuted, therefore encompasses virtually any crime involving the use of extortion to collect a debt or claim, however that claim arises.

In passing the Extortionate Credit Act, Congress was well aware that the statute infringed upon areas traditionally left to state jurisdiction. Some Congressmen opposed the Act on grounds that it interfered unnecessarily with the rights of the states. For example, Congressman Eckhardt argued on the floor: "Should it become law, the amendment would take a long stride by the Federal Government toward occupying the field of general criminal law and toward exercising a general Federal police power; and it would permit prosecution in Federal as well as State courts of a typically State offense."[6] Eckhardt's objections were overridden by the majority, however, who apparently believed that the states were unable to combat effectively loansharking activities by organized crime.[7]

### B. The Conduct of the Defendants

The defendants were convicted under § 894 of attempting to collect a claim by threats of violence. The record discloses no substantial evidence of loansharking or organized criminal activity.

Defendant, Cheiman, a pharmacist, was a part owner of three drug stores in the metropolitan Detroit area, including the Medi-Mart store in Bloomfield Hills, Michigan. In September, 1974, Cheiman hired Art Sklar, a pharmacist who had managed other drug stores, to run the Medi-Mart store. It was understood that if both parties were agreeable Sklar might later buy a quarter interest in the store for $15,000 to $18,000. In October, Cheiman threatened to fire Sklar if Sklar refused to invest in the operation. Sklar, whose paychecks had bounced twice, decided not to invest in the financially troubled pharmacy but did not tell Cheiman.

Approximately two weeks after Cheiman's threat, Sklar was working at Medi-Mart when a female employee told him that a toilet was overflowing in a back room. Sklar hurried to the room only to find himself trapped there by Cheiman and two other men, defendant Sardelis and Weiczorek (an unindicted co-conspirator). Holding a paper bag of drugs, Cheiman accused Sklar of attempting to steal the drugs from the pharmacy. When Sklar denied the charges, Sardelis, a recent law school graduate who had formerly been a bill collector, grabbed Sklar around the neck and pushed him, then began to tap him on the shoulder with a baseball bat. When Sklar again refused to admit any theft, Sardelis pulled out a revolver, pointed it at Sklar's chest and showed him a bullet. Sardelis said it was a soft lead bullet which "goes in very small but comes out real big." Frightened, Sklar then signed a typed "confession" produced by Cheiman, stating that Sklar had stolen a total of $7,000 worth of drugs from Medi-Mart (a bag each day since Sklar had started working there) and that he would make full restitution of the amount. The men also forced Sklar to write a check for $7,000 to Medi-Mart; and Sardelis took $20 to $30, an American Express Card, and a driver's license from Sklar's wallet. Finally, Cheiman told Sklar that if he did not pay the $7,000 within a week that Sklar would be hearing from Sardelis. Sardelis also threatened that if Sklar refused to pay or went to the police that Sardelis might harm Sklar's family and would prevent him from keeping any job with another pharmacy.

---

**5.** Title II of the Consumer Credit Protection Act, Pub.L. No. 90–321, § 201(a)(3), 82 Stat. 159, *reprinted in Perez v. United States, supra,* at 147 n.1, 91 S.Ct. at 1358 n.1.

**6.** 114 Cong.Rec. 1610.

**7.** *Id.,* at 14490.

Sklar, who immediately contacted an attorney, the F.B.I., and the Detroit Police Department, later telephoned Cheiman several times trying to learn the identity of Sardelis whom the others had referred to only as "Nicky." Cheiman refused to say, telling Sklar, "I don't want nothing further to do with him. I had to get off the hook and I'm off the hook. You're on it." On November 12, Sardelis called Sklar's home and told Sklar's son that his father's time was about up. On November 14, Sardelis called again, telling Sklar's wife, "You can just tell Art he had better make good on his debts real quick."

Cheiman and Sardelis were each convicted of one count of violating § 894 for threatening Sklar in the back room of the pharmacy. Sardelis was also convicted in a separate count for his threatening telephone call to Sklar's wife on November 14.

## II. APPLICATION OF THE STATUTE TO DEFENDANTS' CONDUCT

The basic question here is whether the statute should be interpreted broadly according to its text, its so-called "plain meaning" or narrowly according to "the equity of the statute." As Chief Justice Bromley said in 1554, "The judges who were our predecessors have sometimes expounded the words quite contrary to the text . . . in order to make them agree with reason and equity."[8] The Supreme Court has indicated, however, in two recent cases, *United States v. Culbert*[9] and *Perez v. United States,*[10] that a statute like this one should be applied according to its text without using rules of statutory construction to add elements to the crime or contract its coverage.

In *Culbert,* the Supreme Court this term, in a unanimous opinion by Justice Marshall, refused to narrow the text of another extortion statute, the Hobbs Act,[11] also aimed at organized crime. Finding the meaning of the statute clear from the text, the Court overruled decisions of this Circuit and the Ninth Circuit holding that conviction under the Act required proof of "racketeering." "It is inconceivable," the Court said, "that, at the time Congress was so concerned about clearly defining the acts prohibited under the bill, it intended to make proof of racketeering—a term not mentioned in the statute—a separate prerequisite to criminal liability under the Hobbs Act."[12]

Similarly, the Extortionate Credit Act whose terms were intended to encompass a broad scope of criminal activity, does not make proof of loansharking, organized crime or racketeering "a separate prerequisite to criminal liability."

In *Perez v. United States,* the defendant attacked the constitutionality of the Extortionate Credit Act on the grounds that Congress had no power under the Commerce Clause to make a federal offense of purely intrastate activity. As previously pointed out, the statute makes it unnecessary to prove the use of interstate facilities or any effect on interstate commerce. Justice Douglas, writing for the majority, declined to read into the statute any jurisdictional requirements concerning the effect on interstate commerce and upheld the statute on the basis of Congressional findings that, as a class of activities, extortionate credit transactions have an inherent impact on

8. *Fulmerston v. Steward,* (1554) Plowd. 109. *See* Plucknett, *A Concise History of the Common Law,* 334 (5th Ed. 1956); S. Thorne, *A Discourse on the Exposition & Understanding of Statutes,* 77–79 (1942).

9. 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978).

10. 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).

11. The Hobbs Act, 18 U.S.C. § 1951, provides in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

12. 435 U.S. at 378, 98 S.Ct. at 1116.

interstate commerce. Extortion "in its national setting is one way organized interstate crime holds its guns to the heads of the poor and the rich alike and syphons funds from numerous localities to finance its national operations."[13] Justice Stewart dissented "because I am unable to discern any rational distinction between loansharking and other local crime," concluding that "the definition and prosecution of local, intrastate crime are reserved to the states under the Ninth and Tenth Amendments."[14]

A reading of these two cases, *Culbert* and *Perez,* leads us to the conclusion that federal courts may not read into this extortion statute additional elements requiring proof of loansharking, organized crime or interstate commerce. No federal appellate court has been willing to read such a requirement into the statute.[15] Although the effect of this reading is to permit virtually plenary federal jurisdiction over extortionate debt collection practices, Congress has precluded the courts from constructing jurisdictional limitations on the statute and committed to administrative discretion the responsibility of reasonable enforcement of the Act.

The basis for the federal, as distinguished from the local, interest in prosecuting this case does not appear from the record, and we join the District Judge in questioning the wisdom of a statute which vests unguided discretion in federal prosecutors over

local offenses without the limitations of statutory or administrative standards.[16] But Congress has expressed its purpose in a clear statute, the constitutionality of which is no longer in question; and the principle of legislative supremacy requires us to enforce the statutory language. The judgment of the District Court is therefore reversed and the case is remanded with instructions for the District Court to reinstate the jury verdict and proceed with sentencing.[17]

**13.** *Perez v. United States, supra,* at 157, 91 S.Ct. at 1363.

**14.** *Id.* at 158, 91 S.Ct. at 1363.

**15.** *United States v. Sears,* 544 F.2d 585 (2nd Cir. 1976) (case involving loan between two friends characterized as "trivial"); *United States v. Keresty,* 465 F.2d 36 (3rd Cir. 1972), *cert. denied,* 409 U.S. 991, 93 S.Ct. 340, 34 L.Ed.2d 258 (dice game); *United States v. Schaffer,* 539 F.2d 653 (8th Cir. 1976) (gambling); *United States v. Andrino,* 501 F.2d 1373 (9th Cir. 1974) (debts arising from gin rummy game); *United States v. Briola,* 465 F.2d 1018 (10th Cir. 1972), *cert. denied,* 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973).

**16.** Davis, *Discretionary Justice* 60–74 (1976).

**17.** The defendants' secondary argument is that there was never a debt and therefore no "extension of credit" within the meaning of

§ 891(1). This argument is insubstantial. An admission of robbery is not a good defense against a charge of extortion. The defendants forced Sklar to sign an agreement to pay a false claim in the future. Then, on the same day and in an attempt to collect the claim, the defendants forced Sklar to sign a check, gave him a deadline to make the check good, and attempted to collect on the check by implied threats of physical harm.

Neither is there any substance to defendants' double jeopardy argument. The District Judge set the verdict aside as a matter of law on motion in arrest of judgment. There will only be one trial for the same offense. There is no risk of reprosecution. The Supreme Court has answered this argument in *United States v. Scott,* —— U.S. ——, ——, 98 S.Ct. 2187, 2192, 57 L.Ed.2d 65 (1978).