**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert Neil GOODE, Defendant–
Appellant.**

**No. 90–4155.**

United States Court of Appeals,
Tenth Circuit.

Sept. 26, 1991.

---

Robert Van Sciver, Salt Lake City, Utah, for defendant-appellant.

Dee Benson, U.S. Atty. (David J. Schwendiman, Asst. U.S. Atty., with him on the brief), Salt Lake City, Utah, for plaintiff-appellee.

Before HOLLOWAY, LOGAN and BALDOCK, Circuit Judges.

LOGAN, Circuit Judge.

Defendant Robert Neil Goode appeals his conviction after a jury trial for using extortionate means to attempt to collect an extension of credit in violation of 18 U.S.C. § 894(a)(1). On appeal he challenges the court's, and jury's, findings that (1) § 894 applies to the collection of legal judgment debts, (2) an "extension of credit" as defined by § 891(1) exists in this case, and (3) defendant had requisite knowledge of the extension of credit before he placed a threatening telephone call on April 30, 1990.

In a civil lawsuit David Whitney obtained a judgment against Lawrence Faulkner for approximately $550,000. When Whitney's efforts to collect on the judgment were unsuccessful, he hired defendant to assist. In the course of the collection attempts defendant made at least one telephone call in which he threatened harm to Faulkner's children if Faulkner did not pay the debt.

I

Defendant first argues that § 894 was not intended to apply to the use of extortionate means to collect a legitimate debt, but only to collect debts arising out of illegal, loan sharking, or other similar activities. It is true that the statute was enacted as a response to illegal gambling and loan sharking activities. *See Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). Also, most of the cases interpreting and applying § 894 have involved illegal or bad faith debts. *See, e.g., United States v. Polizzi,* 801 F.2d 1543, 1557 (9th Cir.1986) (debt arising from "swindle"); *United States v. DiPasquale,* 740 F.2d 1282 (3d Cir.1984) (drug debts), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985); *United States v. Mase,* 556 F.2d 671 (2d Cir.1977) (gambling losses), *cert. denied,* 435 U.S. 916, 98 S.Ct. 1472, 55 L.Ed.2d 508 (1978); *United States v. Roberts,* 546 F.2d 596 (5th Cir.1977) (gambling debts), *cert. denied,* 431 U.S. 968, 97 S.Ct. 2927, 53 L.Ed.2d 1064 (1977); *United States v. Annerino,* 495 F.2d 1159, 1166 (7th Cir.1974) (unauthorized use of credit cards).

Nevertheless, the language of the statute is not limited to attempts to collect illegal or illegitimate extensions of credit. Rather, the statute says that it is unlawful to use extortionate means to "collect or attempt to collect any extension of credit...." 18 U.S.C. § 894(a)(1). Under § 891(1), an extension of credit includes an agreement to defer "the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising...." When the terms of the statute are clear and unambiguous we need not resort to legislative history.[1]

Further, this court has previously stated as follows:

> age to persons who have engaged in 'racketeering.' ... The statute, moreover, carefully defines its key terms.... Hence the absence of any reference to 'racketeering'—much less any definition of the word—is strong evidence that Congress did not intend to make 'racketeering' an element of a Hobbs Act violation." *Id.* at 373, 98 S.Ct. at 1113.

---

1. The United States Supreme Court addressed a similar issue when it decided that application of the Hobbs Act should not be limited to persons involved in racketeering, although the legislative history revealed racketeering was the target of the statute. *United States v. Culbert,* 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978). The Court stated "[n]othing on the face of the statute suggests a congressional intent to limit its cover-

"It is undoubtedly true that this statute was primarily aimed at what is commonly called loansharking, but it is not limited in its terms to a loan in the sense of money passing. *See Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). From our reading of *Perez* we are convinced that the real thrust of the legislation is directed to the use of extortionate means in order to collect monies which the creditors maintain are owing to them, regardless of whether the loan arose from a traditional type of loan or resulted from the assumption of responsibility as the result of force or threats."

*United States v. Briola*, 465 F.2d 1018, 1021 (10th Cir.1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973). We have applied the statute to the collection of delinquent loan accounts without inquiry into the legitimacy of the loan. *United States v. Boley*, 730 F.2d 1326 (10th Cir.1984). *See also United States v. Natale*, 764 F.2d 1042 (5th Cir.1985) (car restoration loans and agreement to split profits); *United States v. Sedlak*, 720 F.2d 715 (1st Cir.1983) (loan to purchase cars with agreement to split profits), *cert. denied*, 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984). The plain language of the statute and our *Boley* and *Briola* cases support application of § 894 to an extortionate attempt to collect a legal judgment debt; we reject defendant's argument to the contrary.

## II

■ The more difficult issue is whether the instant case involves any "extension of credit" within the meaning of § 891(1). That section defines an extension of credit as follows:

"(1) To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred."

The circuits are not in agreement as to whether a mere debt meets the statutory definition of an "extension of credit." *Compare DiPasquale*, 740 F.2d at 1288 ("a claimed debt is one type of extension of credit under section 891(1)"), *with United States v. Boulahanis*, 677 F.2d 586, 590 (7th Cir.1982) ("Section 894 does not make it a crime to use extortion to collect debts ..."), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982). We need not decide here whether the statute applies to the collection of a simple debt, such as the civil judgment at issue here, because the government has not made that argument. Rather, to constitute an extension of credit, it depends upon an oral agreement between Faulkner and Whitney that Whitney would accept $50,000 currently and $1,000 per week in satisfaction of the judgment. Although in one place in his testimony Whitney, who testified for the defense, denied agreeing to deferred payments, III R. 32, in another place he admitted an April 29 conversation with Faulkner in which he agreed to take deferred payments. III R. 28–29.[2] *See also* II R. 36–37 (Faulkner

2. This evidence is as follows:

"Q. [Cross examination by government counsel] All right. Do you recall, also, him [Faulkner] telling you, 'I can't come up,' or, 'I couldn't come up with the full 50'?
A. [Whitney] Yes.
Q. And your telling him, 'Well, you know it's supposed to be the full 50. I'll try to help you out if it's 50, but, if not, I don't know. It depends on what it is. I'll take a look at it tomorrow morning. Call me tomorrow morning and we'll talk about it.'
A. Okay.
Q. That's got to do with accepting what he could get you, and deferring the rest until he had more.
A. Sure.

Q. Now, please look on Page 3.
A. All right.
Q. Do you recall him saying to you, 'Well, I don't know exactly what I'm going to do. I mean, if this guy is going to continue to harass me ...,' and then you're saying, 'No, that's the deal. I told you I'll do my best to see that it does not happen again if you make this first initial payment.'
Do you recall that conversation?
A. Oh, yes. Yes.
Q. And that also has to do with this making a payment, and then getting what you could, down the road.
A. Yeah. Yes.
Q. And just a couple more: If you'll look on page 6, at the very bottom, do you recall saying to Mr. Faulkner, 'I'll keep track of all

testimony). It is apparent Whitney had tried every means to collect the full judgment, but he was basically willing to collect whatever he could when he could get it. The evidence is sufficient that a jury could find that an agreement to extend credit, within the terms of § 891(1), existed between Faulkner and Whitney. *Cf. Polizzi*, 801 F.2d at 1557 ("there was an extension of credit as long as there was at least a tacit agreement to defer repayment"); *Boulahanis*, 677 F.2d at 590 ("If the previous night [the creditor] had given [the debtor] additional time to pay ... such a deferral would be within the reach of section 894.").

### III

 Finally, defendant argues there was insufficient evidence that he knew of the existence of an extension of credit at the time he made the threatening call which formed the backbone of the government's case, at 4:30 p.m. on April 30, 1990. *See* II R. 51, 65; III R. 53. The government relies upon the testimony of Gary Sorrells to prove the requisite knowledge of the crime. Sorrells testified that defendant met with him at 11:00 p.m. on that April 30 date, six and a half hours after defendant had threatened Faulkner. In the course of that conversation defendant expressed knowledge of the arrangement between Whitney and Faulkner. Defendant argues there is nothing to indicate that he acquired that knowledge before 4:30 p.m., and hence the evidence is insufficient to support a jury verdict that he knew of the agreement at the time of the call.

There was, however, other evidence in the record that defendant himself was negotiating in terms of the payment of $50,-000 down and the rest to be deferred. *See* II R. 38; III R. 64, 67. Even without such evidence, we think that a jury reasonably could infer from the circumstantial evidence of the 11:00 p.m. meeting with Sorrells that defendant knew of the credit

your payments, and when you're paid, I'll call you.'
A. Yeah, sure. I was under the impression that I was going to get $50,000, and a thousand dollars a week thereafter. But that re-

arrangement at the time of his call earlier in that day, since the arrangement was in place at least by the previous day.

AFFIRMED.

lates to previous telephone conversations. See, I didn't know that number when this evinced."
III R. 28–29.