**UNITED STATES of America**

v.

**Brian PETTIFORD.**

**Criminal Action No. 96–291–JLA.**

United States District Court,
D. Massachusetts.

July 23, 1996.

James Rehnquist, Assistant United States Attorney, Boston, MA, for the government.

John Colucci, George Gormley, Gormley & Colucci, P.C., Cambridge, MA, for defendant.

## FINDINGS AND ORDER ON PROBABLE CAUSE AND DETENTION

ALEXANDER, Chief United States Magistrate Judge.

Defendant appeared before this Court on June 26, 1996, pursuant to a criminal complaint charging him with violations of 18 U.S.C. § 1951(a) (Hobbs Act) and 18 U.S.C. § 924(c) (use of firearm during crime of violence). The government, through Assistant United States Attorney James Rehnquist, moved to detain defendant pursuant to 18 U.S.C. § 3142(f)(1)(A) (crime of violence) and § 3142(f)(2)(A) (risk of flight). The hearing on probable cause and detention was continued to June 28, 1996.

When the hearing was reconvened, AUSA Rehnquist again represented the government and Attorney John Colucci, standing in for Attorney George Gormley, appeared on behalf of defendant by court appointment. The government called Special Agent John Paolillo of the Bureau of Alcohol, Tobacco and Firearms who offered credible and reliable testimony as follows.

Just after midnight on May 30, 1996, while John Bickerstaff was stationed at the towing office of Stadium Auto Body at 305 Western Avenue, Brighton, MA, two men entered the office under the pretense of picking up a car that had been towed. One of the two men ordered Mr. Bickerstaff to "get down on the floor" while the other pointed a gun at Mr. Bickerstaff and one of the two commanded, "don't move or I'll shoot." After ripping the phones and phone lines from the walls, the men fled from the office with a strong box containing approximately $200 in cash.

At about 12:20 AM, Massachusetts State Trooper Wanza Adell saw two men, one carrying a gun, running down the street away from Stadium Auto Body which he observed had been ransacked. Trooper Adell pursued the man carrying the gun and hollered at him to drop his weapon. When the suspect turned and appeared to point the gun at the trooper, he fired at the suspect, wounding him. Police apprehended defendant, suffering from a gunshot wound, in a lot adjacent to Stadium Auto Body and a 9MM Taurus automatic handgun was discovered approximately 30–40 feet away from him. The empty strong box was discovered along the escape route. Special Agent Paolillo could not recall whether the strong box had contained any other items, such as credit card slips or insurance receipts. Mr. Bickerstaff later identified defendant as one of the individuals in the towing office of Stadium Auto Body. After being advised of his rights, defendant admitted to being in the towing office with a friend who had produced a gun and demanded money.

Special Agent Paolillo spoke to Fred DiStefano, vice president and manager of Stadium Auto Body which operates the towing service and automobile repair business at issue. Mr. DiStefano reported that most towing customers pay for their cars with nationally operated credit cards such as Mastercard, VISA, and Discover. In addition, the majority of the bills generated by his repair business are paid by nationwide insurance companies such as Traveller's, Liberty Mutual, and Metropolitan Life. Finally, Mr. DiStefano stated that Stadium Auto orders sheet metal from a company in Connecticut and procures other parts from F & L Auto Parts in New Hampshire and Joey's Recycling in Rhode Island.

At the close of the hearing, based on the credible and reliable testimony of Agent Paolillo, the Court found probable cause to be-

---

lieve defendant violated 18 U.S.C. § 924(c). The Court took under advisement the issue of probable cause of a Hobbs Act violation and resolves the matter now.

■ Because defendant allegedly robbed a business that, like most, engages in some small degree of interstate commerce, the government charges a Hobbs Act violation. The Hobbs Act proscribes conduct that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion...." 18 U.S.C. § 1951(a) (West 1996). The breadth of the act and the scope of prohibited conduct is dictated by the interpretation of the term "affect commerce." The Supreme Court concludes that Congress intended the Hobbs Act to stretch as far as the Constitution permits and to criminalize all conduct encompassed by the expansive statutory language.[1] *United States v. Rivera–Medina*, 845 F.2d 12, 15 (1st Cir.1988), citing *United States v. Culbert*, 435 U.S. 371, 373, 98 S.Ct. 1112, 1113–14, 55 L.Ed.2d 349 (1978); *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). Moreover, the Court stated that

> [w]ith regard to the concern about disturbing the federal-state balance, ... there is no question that Congress intended to define as a federal crime conduct that it knew was punishable under state law. The legislative debates are replete with statements that the conduct punishable under the Hobbs Act was already punishable under state robbery and extortion statutes.... Congress apparently believed,

however, that the States had not been effectively prosecuting robbery and extortion affecting interstate commerce and that the Federal Government had an obligation to do so.

*Culbert*, 435 U.S. at 379–80, 98 S.Ct. at 1117 (citations omitted); *see also, United States v. Sturm*, 870 F.2d 769, 771 (1st Cir.1989).

Thus the critical inquiry here is whether the government has shown that, under the standards enunciated by the Supreme Court, the alleged criminal activity sufficiently affected interstate commerce.

Consistent with the Supreme Court holdings in *Stirone* and *Culbert*, the First Circuit has held that a robbery affects commerce if there is a realistic probability of any slight, *de minimis* effect on interstate commerce.[2] *United States v. McKenna*, 889 F.2d 1168, 1171–72 (1st Cir.1989); *Rivera–Medina*, 845 F.2d at 15; *United States v. Jarabek*, 726 F.2d 889, 900–01 (1st Cir.1984). Defendant contends that on the heels of *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and a recent First Circuit opinion, *United States v. DiSanto*, 86 F.3d 1238 (1st Cir.1996), the government's burden is enhanced. He urges that the government must establish the robbery had a substantial effect on interstate commerce. The government disagrees, maintaining that the requisite nexus has not increased and still needs only to be a *de minimis* connection to interstate commerce.

In *Lopez*, the Supreme Court invalidated the Gun–Free School Zones Act of 1990[3] as

---

1. The predecessor to the Hobbs Act, the Anti-Racketeering Act of 1934, ch. 569, 48 Stat. 979, was enacted, as the name implies, to curb racketeering. *United States v. Culbert*, 435 U.S. 371, 374, 98 S.Ct. 1112, 1114, 55 L.Ed.2d 349 (1978). The Hobbs Act was an attempt to clarify the criminalized conduct by using the language "robbery or extortion," words that "have been construed a thousand times by the courts. Everybody knows what they mean." *Id.* at 378, 98 S.Ct. at 1116 quoting 91 Cong.Rec. 11912 (1945) (remarks of Rep. Hobbs). And, proponents of the bill insisted the purpose of the bill, also reflected in the purpose statement of the Report of the House Committee on the Judiciary, was to "prohibit robbery and extortion perpetrated by anyone." *Id.* at 377, 98 S.Ct. at 1115, quoting 91 Cong.Rec. 11900 (remarks of Rep. Hancock).

2. In *United States v. Yokley*, effectively overruled by *Culbert*, Chief Judge Phillips portends: "[U]nder the *de minimis* interstate commerce rule, the robbery of a corner grocery store, pharmacy or gasoline service station, without more, would be a federal offense.... [A]rmed robbery, traditionally a matter of concern under state criminal laws, would become a matter within the responsibilities of United States Attorneys and the federal courts." 542 F.2d 300, 303 (6th Cir.1976). This Court is not unconcerned that Chief Judge Phillips' prophecy has come to fruition.

3. The Gun–Free School Zones Act forbade "any individual knowingly to possess a firearm at place that [he] knows ... is a school zone." 18 U.S.C. § 922(q)(1)(A).

an unconstitutional exercise of congressional power under the Commerce Clause. Because the Act neither "regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected in any way to interstate commerce," the Court held the Act "exceeds the authority of Congress to 'regulate Commerce ... among the several States....' " *Lopez,* —— U.S. at ——, 115 S.Ct. at 1624, quoting U.S. Const., Art. I, § 8, cl. 3. Focusing on the fact that gun-free law was a criminal law wholly unrelated to economic activity or commerce, the Court concluded the "proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* at ——, 115 S.Ct. at 1630.

However, the Court did not specifically hold that the substantial effect test is the appropriate scrutiny for all statutes, such as the Hobbs Act, using the language "affecting commerce" to define their scope. As Justice Breyer opines in his dissent,

> Congress has enacted many statutes (more than 100 sections of the United States Code), including criminal statutes (at least 25 sections), that use the words "affecting commerce" to define their scope, see, *e.g.,* 18 U.S.C. § 844(i) (destruction of buildings used in activity affecting interstate commerce).... Do these, or similar statutes regulate noncommercial activities? If so,

would that alter the meaning of "affecting commerce" in a jurisdictional element?

*Id.* at ——, 115 S.Ct. at 1664 (Breyer, J., dissenting).[4]

To the extent that *Lopez* does not explicitly alter the government's burden of proof under the Hobbs Act and the First Circuit has yet to face a *Lopez*-challenge to the Hobbs Act, the Court need only detect a *de minimis* nexus between the instant robbery and interstate commerce in this case.[5]

 In the present case, the government has established a *de minimis* connection to interstate commerce to support a probable cause finding of a Hobbs Act violation.[6] In the absence of a direct connection between the robbery or extortion and interstate commerce or articles moving in interstate commerce,[7] courts have relied on a "depletion of assets" theory of indirect effect on interstate commerce. *See, e.g., United States v. Bolton,* 68 F.3d 396 (10th Cir.1995); *United States v. Mattson,* 671 F.2d 1020, 1024 (7th Cir.1982). Under this theory, " 'commerce is affected when an enterprise, which is either actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted ..., thereby curtailing the victim's potential as a purchaser of goods.' " *Bolton,* 68 F.3d at 398, quoting *United States v. Zeigler,* 19

---

**4.** The First Circuit declined to reconsider the nexus issue in light of *Lopez* in the context of the federal arson statute, 18 U.S.C. § 844(i).

> We need not address Appellant's contention that our holding in [*United States v.*] *Medeiros* [897 F.2d 13 (1st Cir.1990)] that the government need only show a *de minimis* connection to interstate commerce is invalidated by *Lopez.* We merely note that while the *Lopez* decision did not address the amount of evidence required to prove a jurisdictional element of an offense, this does not necessarily mean that it is not controlling when determining how significant the connection to interstate commerce must be in order to satisfy the jurisdictional element.

*DiSanto,* 86 F.3d at 1248, n. 8.

Although insinuating that *Lopez* may impact the nexus inquiry, the First Circuit declined to definitively declare that the government must prove a substantial affect on interstate commerce under the federal arson law.

**5.** Other circuits that have reached the issue have held the same. The Tenth Circuit holds that in

the wake of *Lopez,* precedent construing the Hobbs Act to mandate merely a *de minimis* effect on interstate commerce still holds water. *United States v. Bolton,* 68 F.3d 396, 398 (10th Cir. 1995). Similarly, the Seventh Circuit has said, "the Court [in *Lopez* ] did not call into question the Hobbs Act which ... is aimed at a type of economic activity ... and contains an express jurisdictional element. Nor did the *Lopez* decision undermine the Court's precedents that minimal potential effect on commerce is all that need be prove ..." *United States v. Stillo,* 57 F.3d 553, 558 n. 2 (7th Cir.1995).

**6.** Significantly, this is a probable cause hearing where the government is only required to prove that the existence of each element is more probable than not. Whether the government can prove a *de minimis* nexus to interstate commerce beyond a reasonable doubt should this case go to trial is not of this moment.

**7.** For example, the theft of goods which actually travel in the channels of commerce is a direct impact on interstate commerce.

F.3d 486, 490 (10th Cir.1994) (citation omitted). Therefore, the "government need only produce evidence establishing that the assets of a business engaged in interstate commerce were depleted during the commission of a crime." *Id.* Given the broad statutory language, the government's burden is not onerous and any minimal effect on interstate commerce will suffice to meet the jurisdictional requirement of affecting interstate commerce. See, e.g., *Bolton,* 68 F.3d 396; *United States v. McKenna,* 889 F.2d 1168 (1st Cir.1989) (minimal depletion of assets will suffice); *United States v. DiGregorio,* 605 F.2d 1184, 1191 (1st Cir.1979) (similar).

In *Bolton,* for example, defendant's crime spree consisted, in part, of four separate robberies. In each one, the defendant stole relatively small amounts of cash from businesses that engage in interstate commerce. In three of the heists, the defendant stole money that would have been used to purchase supplies, food and alcohol from out of state. In the fourth, the company bought scrap metal, processed it and shipped it to out-of-state recyclers and the money stolen would have been used to purchase scrap metal. In each case, the court found that but for the depletion of assets due to the robbery, each victim would have spent more money in interstate commercial activities. That alone sufficiently demonstrated a *de minimis* connection to interstate commerce to sustain a Hobbs Act conviction.

Similarly, in the instant case, the government presented evidence that Stadium Auto Body engages in interstate commerce. For example, Stadium accepts national credit cards as payment for services rendered and receives reimbursement from insurance companies that operate nationwide. In addition, Stadium orders sheet metal from a company in Connecticut and obtains other parts from companies in New Hampshire and Rhode Island. That the government tendered no evidence that credit card slips were stolen, that the stolen cash was proceeds from national insurance companies or that the stolen money would have been used to purchase parts from out of state companies is inconsequential. Given that Stadium engages, at all, in interstate commerce, one might divine that some or all of the $200 stolen was earmarked to buy materials from out of state. The minimal depletion of assets and its potential impact on Stadium's commercial activity, albeit slight, is sufficient evidence of a reasonable probability of a *de minimis* effect on interstate commerce to sustain a probable cause finding of a Hobbs Act violation.

At a hearing held on June 28, 1996, the Court found probable cause that defendant had violated 18 U.S.C. § 924(c) as charged. At that hearing, the defendant waived his right to a detention hearing and consented to pretrial detention at that time. Accordingly, defendant is hereby detained. Further, pursuant to 18 U.S.C. § 3142(i) it is ORDERED that:

1. The defendant be, and hereby is, committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2. The defendant be afforded reasonable opportunity for private consultation with counsel; and

3. On Order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility in which the defendants are confined shall deliver the defendants to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

SO ORDERED.