NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-3670
_____

UNITED STATES OF AMERICA

v.

MAURICE LEBRON DAVIS,
a/k/a Maurice Pringle

Maurice Lebron Davis,
Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 1-13-cr-00028-001)
District Judge:  Honorable John E. Jones, III

Submitted Under Third Circuit LAR 34.1(a)
September 7, 2016

BEFORE:  JORDAN, VANASKIE, and NYGAARD, *Circuit Judges*

(Filed:  October 18, 2016)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

NYGAARD, *Circuit Judge.*

Maurice Lebron Davis appeals the judgment of conviction entered on the jury's verdict of guilty on four counts of Hobbs Act robbery and four counts of Hobbs Act attempted robbery. 18 U.S.C. § 1951. The District Court sentenced Davis to 235 months' imprisonment on each count, to be served concurrently. He asserts now that there was insufficient evidence to support the verdict. We will affirm.

This opinion does not have any precedential value. Therefore, our discussion of the case is limited to covering only what is necessary to explain our decision to the parties. In reviewing challenges to the sufficiency of the evidence supporting a conviction, we apply a "particularly deferential standard of review." *United States v. Powell*, 693 F.3d 398, 401 n. 6 (3d Cir. 2012)(quotation marks omitted). We look at the entire record, examining both direct and circumstantial evidence, to ascertain the sufficiency of the evidence.

Police arrested Davis after an early-morning incident at an Arby's restaurant. An Arby's employee reported that, around 7 A.M., on February 24, 2012 she discovered a smashed window, next to a cash register at the drive-through area of the restaurant, and a rock laying nearby that she believed was used to break the window. She said that the napkin dispenser inside the drive-through area had been "jumbled." The employee also noted seeing a black SUV parked nearby in an unusual location. Around the same time, another person called to report a suspicious man running by his office building, which was near Arby's, with his face covered by a cloth. He observed the man dumping napkins (later identified as Arby's napkins, one smeared with blood matching Davis'

2

DNA) into a dumpster. The man was looking in the direction of Arby's. He saw the man taking off some clothes and placing them near the dumpster. The witness photographed the man. Police apprehended Davis a short time later. The witness had sight of him throughout this entire time. They found a shard of glass in Davis' shoe consistent with the broken glass at the Arby's. The clothes recovered near the dumpster were ripped and had blood on them. Police later determined that the blood matched Davis' DNA. Upon questioning, Davis offered police only vague, uncorroborated reasons for being in the area. When told about the incident at Arby's, Davis said "they won't be able to describe me." App. 184. Police arrested Davis soon thereafter on the crime charged at Count Ten.

Following Davis's arrest and upon further investigation, police obtained a warrant to search the residence of a friend of Davis, Sharef Flounoy. Police recovered an encrypted note from Davis, written from prison and addressed to Flounoy's residence, that they later decrypted.[1] It said, in part, "I need for the Arby's to get its window broke again. . . .The perfect time is 4:20 in the morning." App. 280. They also found a cell phone with a phone number that Davis' parents had earlier told police belonged to Davis, and a cell phone police linked to Flounoy. Finally, they learned that Flounoy's girlfriend had a black SUV, similar to one described by the Arby's employee.

Aware of a string of recent fast-food restaurant robberies and attempted robberies, police broadened their investigation. At trial, the Government proffered cell-tower data placing the phone number associated with Davis at or near a number of crime scenes

---

[1] Investigators unencrypted the letter using a common cipher found on the internet.

around the times that the crimes were committed.[2]  Specifically, the Government argued that this evidence placed Davis at the scenes of the following crimes:  the robbery at the Mechanicsburg Chik-Fil-A on December 23, 2011 (Count One); the attempted robbery at the Camp Hill, Simpson Ferry Road Wendy's on December 23, 2011 (Count Two); the robbery at the Harrisburg, Cameron Street Burger King on January 6, 2012 (Count Seven); the attempted robbery at the Carlisle Wendy's on January 6, 2012 (Count Eight); and the attempted robbery at the Carlisle McDonalds on February 24, 2012 (Count Nine). For the crimes charged in Counts One, Two, Seven, and Nine, cell tower data additionally showed calls being made from the number associated with Davis to the number associated with Flounoy at times close to the robberies.  Regarding the crime charged in Count Seven, there was also a call made from the phone number associated with Davis to Amtrak shortly after the robbery.  It was later determined that Davis and Flounoy had tickets for travel on Amtrak that same day.

The evidence linking Davis to the scene of the crime was not uniform as to each count charged.  Nonetheless, for the counts in which cell-tower data was more ambiguous, the Government proffered witness descriptions that were consistent with those offered at the scenes where cell-tower data was more accurate.  For instance, the robbery at the Camp Hill, 21st Street Wendy's on December 31, 2011 (Count Three), and the attempted robbery at the Harrisburg, Paxton Street Burger King on December 31, 2011 (Count Four) showed only that the cell phone associated with Davis' number was

---

[2] Cell-tower data is now commonly accepted in federal courts as evidence of a defendant's location.  *See United States v. Jones,* 918 F. Supp. 2d 1, (D.D.C. 2013).

4

active on the days, and in the general locale, of the crimes. Yet, for both crimes, the Government proffered witnesses who had close contact with the robber and identified the perpetrator as a male who wore a bandana or mask over his face. The witness in Count Four further identified the male as African-American. This description aligned with witnesses at other crime scenes who viewed the robber at close range (Counts One, Seven, and Nine) where cell tower evidence did place the number associated with Davis near the crime scene.[3] Specifically, in Counts One and Seven, the witness identified the robber as a black or African-American male, wearing a bandana to cover his face. In Count Nine, the witness could not identify the person's race, but did say that the man disguised his face with a white bag under a hoodie. For other crimes charged (Counts Two and Eight), eye-witnesses only saw a figure from a distance. Nonetheless, cell-tower data placed the phone number associated with Davis near the scene, on the date, and around the time of the robbery attempts.[4]

Moreover, the Government proffered modus operandi evidence. All of the crimes for which Davis was charged centered on fast-food restaurants within relative close proximity to one another, over a span of approximately two months. All of them involved early-morning efforts to either smash a window (either at the drive-through area or the door), or to use threatening conduct directed at an employee to gain entry to the

---

[3] The witness proffered regarding the crime charged in Count Nine saw only a white mask over the robber's face and was uncertain of his race.

[4] This is distinguished from Counts Five and Six, in which the jury found Davis not guilty. In both of these instances, neither location data or witness descriptions could link Davis to the crime scenes.

restaurant. Moreover, as noted above, in every case in which the perpetrator was viewed from close range, the perpetrator was described as a male, acting alone, wearing a cloth or mask to disguise his face. In spite of Davis's contentions to the contrary, we conclude that it was proper for the jury to consider modus operandi evidence in its deliberations, which was only a portion of the case presented by the Government.

Finally, additional evidence resulted from the investigation. As a result of investigators' search of the Flounoy's residence they found, on the phone they associated with Davis, a photo of a stack of $1 bills on a drop-leaf table that looked like the table in Flounoy's residence. The photo was date-stamped January 1, 2012, only one day after the robbery charged in Count Three. They also found on the phone a photo of Davis and a woman identified as his girlfriend. Moreover, when questioned, Davis maintained that he was in New York City on the dates of some of the robberies. Investigators determined that the times of day that could be verified for his presence there did not rule out the possibility that he was also in the area of the robberies on those same days. He did not have alibi evidence relating to any of the crimes.

Davis contends, amidst his general insufficiency of evidence argument, that the evidence presented by the Government does not establish specific intent. We disagree. "Except in unusual cases, intent can be proven only through circumstantial evidence." *United States v. Jannotti*, 673 F.2d 578, 603 (3d Cir. 1982). We are convinced that, as to Davis' general sufficiency challenge and to the particular question on intent he raises, the Government provided sufficient evidence to ground the jury's verdict. *See United States v. Iglesias,* 535 F.3d 150, 155-56 (3d Cir. 2008).

6

The Hobbs Act is intended "'to punish interference with interstate commerce by extortion, robbery, or physical violence.'" *Powell,* 693 F.3d at 402 (quoting *United States v. Culbert*, 435 U.S. 371, 373 (1978)). Davis' appeal attempts to deconstruct the Government's case by isolating individual pieces of the record to argue the inadequacy of each to ground his conviction. However, taken as a whole, there is considerable evidence relating to the crime at the Arby's charged in Count Ten: the physical evidence gathered at the time that Davis was arrested and the DNA match linking him to the ripped clothes, the testimony of the store employee, evidence gathered at the Arby's and the description of the scene by the employee, evidence gathered during the search of Flounoy's residence, the eye-witness description of both Davis' actions and appearance, and the modus operandi evidence linking all of the crimes charged. This body of evidence amply grounded the jury's decision to convict Davis of the crime charged in Count Ten.

The same analysis applies to Davis' argument regarding the other crimes for which he was convicted. The record taken as a whole adequately grounded the jury's verdict as to each count. The Government presented data from cell-towers providing the location of a mobile device with a phone number belonging to Davis and evidence of contemporaneous phone calls made. It also presented evidence gathered at the Flounoy residence (including cell phones and a photo), witness statements describing the robber and his actions, modus operandi evidence linking all of the crimes charged. All of this was more than sufficient to ground the jury's decision to convict Davis of the crimes charged in Counts One, Two, Three, Four, Seven, Eight and Nine.

7

For all of these reasons, we will affirm the District Court's judgment of conviction.